Smith, Herman J., J.
I.INTRODUCTION
These consolidated actions involve a dispute between an attorney and his client over the enforceability of their fee agreement as modified; the attorney’s claims against successor counsel for attorney fees pursuant to the operation of the modified fee agreement; the attorney’s claim against his client’s former wife for tortious interference with advantageous contractual relationship; and her counterclaim for abuse of process. This matter was tried before the Court without a jury.
In his first action, Civil Action No. SUCV200203213, dated July 23, 2002, plaintiff Marc Redlich (“Redlich”) filed a Verified Complaint for Declaratory Judgment and Injunctive relief against defendant Kathleen Lanell (“K. Lanell”) and Escrow Agent Carol Weinstein Boileau (“Boileau”),[1] in which he sought a declaration in Count I that K. Lanell was required to pay him attorneys fees either pursuant to the Contingent Fee Agreement, dated December 27, 2001 and executed on December 31, 2001 (alternatively or contextually “CFA” or “December 27, 2001 CFA”)[2] by Redlich and Peter Lanell (“P. Lanell”) or pursuant to the principle of Quantum Meruit.[3] Redlich also asserted the following counts: Count II, alleging fraud against P. Lanell; Count III, alleging misrepresentation against P. Lanell; Count IV, alleging Civil Conspiracy /Aiding and Abetting against both P. Lanell and K. Lanell; and Count V, alleging interference with advantageous business and contractual relations against K. Lanell. F. Lanell filed four counterclaims alleging: Count I — Misrepresentation; Count II — Fraud; Count III — Unfair and Deceptive Acts or Practices in Violation of G.L.c. 93A, Sec. 2 and 9; Count IV — Breach of Fiduciary Duly; and CountV — Declaratory Judgment.
In his second action (civil action No. SUCV200401303), this time against his former client, Peter Lanell, Redlich asserts four counts: Count I seeks a declaration that Redlich by the operation of the parties’ CFA executed on December 31, 2001, is entitled to 1 /3 of the balance of the $ 1,454,742.50, which i2 Technologies, Inc. (“i2”) tendered in July of 2002 to settle P. Lanell’s litigation against it; Count II alleges that P. Lanell’s July 23, 2002 termination of the CFA was a breach of the contract and done in bad faith; Count III alleges that P. Lanell breached the implied covenant of good faith and fair dealing; and in Count IV Redlich seeks an award of attorneys fees based upon the principle of Quantum Meruit from P. Lanell out of P. Lanell’s second settlement with i2, amounting to $2,599,990.00 that P. Lanell’s second attorney, defendant Steven Ernstoff (“Emstoff’) obtained in December of 2003. P. Lanell filed three counterclaims alleging: Count I — Misrepresentation; Count II— Fraud; Count III — Unfair and Deceptive Acts or Practices in Violation of G.L.c. 93A, Sec. 2 and 9.
II. FINDING OF FACTS A. Marc Redlich v. Kathleen Lanell and Peter Lanell SUCV2002-03213-C
This Court hereby makes the following findings of material facts.
1. The plaintiff Marc Redlich is an attorney licensed to practice law in the Commonwealth of Massachusetts. Attorney Redlich does business under the firm name Law Offices of Marc Redlich, and has a usual place of business at Three Center Plaza, Suite 400, Boston, Massachusetts, County of Suffolk, Commonwealth of Massachusetts.
2. The defendant Peter Lanell is an individual residing at 40 Merrimac Street, Town of Amesbuiy, Essex County.
3. The defendant Kathleen Lanell is an individual residing at 107 South Riverview, Town of Bradford, Essex County.
4. The defendant Steven Emstoff is an attorney who does business under the firm name and style of Steven E. Emstoff, P.C., and has a usual place of business at 500 Commercial Street, Suite 4R, Boston, County of Suffolk, Commonwealth of Massachusetts.
5. In February 2000, P. Lanell was Vice President Worldwide Sales of a company known as Supplybase, Inc. (“Supplybase”). Shortly thereafter, Supplybase merged with a Texas based company known as i2 *690 Technologies, Inc. (hereinafter “i2”). As one of the conditions of the agreement, i2 was required to enter into an employment agreement with P. Lanell. On April 12, 2000, i2 and P. Lanell executed such an agreement, which provided that P. Lanell was to serve as Vice President of Sales of Supplybase or the requisite wholly owned subsidiary of the Company. The agreement set out a commission rate schedule and provided that P. Lanell would “be entitled to an annual sales incentive/commissions payment based upon the achievement of certain sales quota for the period beginning January 1, 2000.” P. Lanell negotiated his employment contract directly with i2 and did not use an attorney to negotiate for him. He negotiated a particularly narrow non-compete clause for himself.
6. As Vice President of i2, P. Lanell ran a business unit with sales of over $100 million a year.
7. In determining the amount of commissions owed to P. Lanell and others in its sales force, i2’s practice was to create “scorecards,” detailing the amount of sales attributable to each person in the sales chain for each customer, and the calculation of the amount of the commission due. A dispute developed between P. Lanell and several sales people who reported to P. Lanell, including Keith Hamel (“Hamel”), and i2, regarding the accuracy of various scorecards prepared by i2. Over the course of the first seven months of 2001, the i2 employees responsible for calculating commissions for these employees had been reviewing the sales in an effort to create accurate scorecards.
8. On July 25, 2001, P. Lanell was informed by Rob Bearden (“Bearden”), his supervisor at i2, that he was being terminated effective August 24, 2001. At or about the same time, Hamel was also terminated. Bearden informed P. Lanell that he would receive all of the commissions and other compensation due him pursuant to his employment contract.
9. Upon learning that he was being terminated, P. Lanell contacted i2’s payroll department and was told by Lisa King (“King”), an employee of i2, that an ECA (Employee Change Authorization) had been submitted for his commissions in the amount of $2,811,585.81 for calendar year 2000. No commission payments were forwarded to P. Lanell or Hamel prior to their termination.
10. On or about August 30, 2001, P. Lanell and Hamel jointly consulted with the Redlich regarding commissions and compensation owed to them by their former employer, i2. Hamel thought he was owed approximately $1.08 million by i2; while P. Lanell thought he might be owed in excess of $2.8 million, based on his conversation with King at i2’s payroll department. After the meeting, Redlich sent them a fee agreement dated September 4,2001. Redlich, P. Lanell and Hamel executed the fee agreement on or about September 10, 2001 (“September 10, 2001 Fee Agreement”) which provided for Redlich to be compensated on an hourly basis at a rate of $365.00 per hour and his associates at $255.00 per hour. In addition, the agreement provided for the payment of a 5% incentive in the event a “resolution” of the matter was reached prior to December 15, 2001. Redlich agreed to issue monthly billing statements to P. Lanell and Hamel.
11. On September 4,2001, P. Lanell and Hamel sent a letter, reviewed by Redlich, to Dave Pace (“Pace”) of i2 demanding payment of their commissions. The letter informed Pace that Lanell and Hamel had retained Redlich as counsel, and that if i2 failed to pay their commissions by September 14, 2001, they would instruct him to commence litigation.
12. Hamel and Lanell each paid Redlich a $1,250.00 retainer, and agreed to each pay one-half of Redlich’s legal fees for common legal services and to each pay separately for individual services.
13. At the time he retained Redlich, P. Lanell was married to defendant K. Lanell. They were in the process of divorce proceedings initiated by K. Lanell in 2000. When Redlich began to represent P. Lanell, Attorneys Boileau (“Boileau”) and Anthony DiFruscia (“DiFruscia”) were representing P. Lanell in his divorce case. Those proceedings were captioned Kathleen Lanell v. Peter T. Lanell, Probate and Family Court Department, Essex County, No. 00D2515-DV1.
14. Shortly after the divorce complaint was filed in 2000, P. Lanell’s assets, including his bank and securities accounts, were automatically restrained and thus unavailable to him. Although he had a significant estate, Lanell’s use of his assets had been substantially limited by virtue of asset restraining orders entered on the divorce complaint. Redlich was fully aware of this restriction from the inception of his attorney-client relationship with P. Lanell.
15. The Lanells’ divorce was unusually contentious from the beginning, and P. Lanell so advised Mr. Redlich.
16. As part of the divorce case, both Lanells filed periodic financial statements. P. Lanell’s statements dated July 25, 2001 and September 6, 2001 did not list the $2.811 million which P. Lanell claimed he was owed by i2, and of which he was advised by King on or around July 25, 2001.
17. Also as part of the divorce case, K. Lanell’s divorce attorney, John Legasey (“Legasey”), took P. Lanell’s sworn deposition on August 22, 2001. P. Lanell testified in that deposition that he believed i2 owed him approximately $454,000.00. This was after his discussion with Lisa King and only about a week before his initial meeting with Mr. Redlich, described above.
18. By September 14, 2001, John Harvey (“Harvey”), assistant corporate counsel for i2 and whose business office was located at i2 headquarters in Texas, contacted Redlich in response to the demand letter Hamel and P. Lanell had sent.
*691 19. After further discussions, on September 28, 2001, Harvey sent Redlich a Rule 408 scorecard in the amount of $1,495,671.57, and offered to settle P. Lanell’s claim for that amount plus severance and bonus amounts outstanding. P. Lanell rejected this offer.
20. On October 3, 2001, Redlich wrote to Harvey stating that the Rule 408 scorecard was clearly not all that was owed, and reiterated P. Lanell’s demand for payment of all outstanding compensation. Redlich demanded $2,828,000.00 plus interest and attorneys fees, and informed i2 about the Massachusetts Wage Statute, G.L.c. 149, §148, and its provision for treble damages in these circumstances.[4]
21. On October 5, 2001, Redlich wrote to the Office of the Massachusetts Attorney General, and enclosed a completed Non-Payment of Wage Claim form. He sought and received the right to bring a private civil suit on behalf of P. Lanell against i2.
22. On October 16, 2001, Harvey sent an e-mail to Redlich wherein he raised i2’s offer to $2,180,000.00. He also offered to settle Hamel’s claim for $850,000.00. Redlich relayed the offers to both clients, which were rejected.
23. On October 16, 2001, K. Lanell’s divorce counsel, Legasey, filed a Complaint to Reach and Apply (“Reach and Apply Action”), naming P. Lanell and i2 as defendants, and sought to enjoin i2 from paying directly to P. Lanell the proceeds of any settlement while the divorce was pending. Through her counsel, K. Lanell told the Probate Court that “(t)hroughout the divorce proceedings, Peter has repeatedly disobeyed court orders, and failed to disclose this substantial claim to the Plaintiff or the court via any financial statement or other pleading.” Further, K. Lanell told the court of the “clear danger that Peter will dissipate, convey or conceal any monies received.”
24. K. Lanell stated further, in support of her claim, that “there is a strong likelihood that the Plaintiff will receive a property division that will include a substantial portion of Peter’s claim for past due commissions.”
25. A pleading filed by K. Lanell and her attorney Legasey reflects that K. Lanell sought and was granted a supplement to the automatic restraining order freezing P. Lanell’s bank accounts. Around the same time, a discovery master was appointed in the divorce action.
26. On October 17, 2004, P. Lanell sent an e-mail to Redlich wherein he detailed and explained to him the basis for his claimed commissions of $2.8 million.
27. On October 19, 2001, Redlich incorporated P. Lanell’s analysis in a letter to Harvey, alluded to the treble damages provision of the Massachusetts Wage statute, made a settlement demand on behalf of P. Lanell in the amount of over $2.9 million and advised Harvey that he was preparing a complaint for filing thereunder.
28. On October 26, 2001, Redlich wrote Harvey, advised him that he was prepared to file suit on November 2, 2001 if the matter were not resolved, and provided him with a copy of the Massachusetts Superior Court Complaint.
29. Subsequently, on October 26, 2001, Harvey e-mailed Redlich and offered to settle P. Lanell’s claim for $2.55 million and Hamel’s claim for $1 million. Although Redlich advised P. Lanell to accept the $2.55 million offer, P. Lanell declined.
30. On October 30, 2001, Redlich e-mailed P. Lanell to both inquire about the payment of his legal fees, and also to enclose a draft of a counter-proposal he intended to make to Harvey’s offer.
31. On October 30, 2001, Redlich, on behalf of Hamel accepted i2’s offer to settle his claim for $1 million.
32. On October 30, 2001, P. Lanell’s divorce attorney, Boileau, sent Redlich a check in the amount of $5,000 which had been released from the marital estate as a payment on account toward his outstanding bill.
33. Between October 30 and December 10, 2001, Redlich and his associate Merle Hass zealously worked to finalize Hamel’s settlement. In doing so, they billed him 27.6 hours for negotiating the terms of a settlement with i2 including numerous e-mail correspondence and phone conferences with Harvey resulting in a direct payment to Redlich of $70,000 in fees pursuant to the September 10, 2001 fee agreement, and a subsequent payment to Hamel for the balance of his settlement.
34. On November 1, 2001, Redlich sent a counter-proposal to Harvey to settle P. Lanell’s claim in which he sought to bridge the difference between the $2.55 million offer and the $2.916 million demand by having Lanell accept a combination of i2 stock and cash in exchange for a full settlement and release.
35. Harvey was upset and disappointed that P. Lanell’s claim did not settle for the $2.55 million offered. He testified that the rejection of the $2.55 million offer by Redlich and P. Lanell caused him to retrace i2’s position, go back to square one and try to determine what amount, if any, was owed. This caused him to “go back to the blackboard and try to figure out the scorecard issue.” Harvey then “challenged Emily Hooton and Jill Laird [both employees of 12] to go back through P. Lanell’s commission issue and spend whatever time it took to tell [him] whether [12] owed [Lanell] money or not.”
36. As Harvey had not responded to his counter-proposal, on November 9, 2001, Redlich wrote him again providing additional information regarding P. Lanell’s commissions.
37. On November 26, 2001, Harvey e-mailed Redlich requesting his thoughts on whether the case of Cumpata v. Blue Cross Blue Shield of Massachu *692 setts, 113 F.Sup.2d 164 (D.Mass. 2000), was distinguishable from the P. Lanell case. Cumpata is a decision in which Federal District Court Chief Judge Young found that the Wage Act and its treble damages provision to be generally inapplicable to high-paid executives seeking commission payments in addition to their salaries.
38. K. Lanell and her attorney, Legasey, learned of the $2,811 million ECA in the Fall of 2001. On or before November 28, 2001, they also learned of the $2.55 million offer from i2.
39. After learning this information, Legasey had a telephone conversation with i2’s assistant general counsel Harvey on November 30, 2001. Mr. Legasey told Harvey that P. Lanell had testified at his divorce deposition in August 2001 that he believed i2 owed him only about $454,000.00. Legasey then called Redlich to tell him that i2 had learned of the sworn deposition testimony.
40. On November 30, 2001, Harvey e-mailed Redlich that he had “learned some interesting things recently, we should talk on Monday.” The “interesting things” turned out to be testimony by P. Lanell in a deposition taken on August 22, 2001 in his divorce, in which he stated to the best of his knowledge, i2 owed him $454,000.00 based on a document previously provided by i2 in response to a keeper of the records deposition subpoena. Redlich subsequently spoke with Legasey, divorce counsel to K. Lanell, who forwarded the relevant portion of the deposition transcript to him.
41. P. Lanell learned, in early December 2001, that Redlich had spoken to Legasey about the divorce deposition and i2’s knowledge of it. In a letter to P. Lanell’s divorce attorney, Boileau, Redlich described in detail both his discussion with Legasey on November 30, as well as his discussion with i2’s Harvey shortly thereafter, including Redlich’s opinion about the negative impact such revelation might have on i2’s willingness to settle at a higher figure.
42. On December 4, 2001, Redlich sent an e-mail to Harvey with another copy of a complaint and advised him that he would file a lawsuit on behalf of P. Lanell in Massachusetts on December 7, 2001 unless the parties could reach a resolution to the dispute.
43. By early December 2001, P. Lanell owed Redlich $15,171.61 in attorneys fees.
44. In early December 2001, Redlich discussed with P. Lanell changing the fee arrangement for his continued representation of P. Lanell in litigation to be filed against i2. On December 4, 2001, Redlich sent an e-mail to P. Lanell with a proposed Contingent Fee Agreement that Redlich had drafted and which provided for attorneys fees in the sum of one-third of any monies recovered from i2, payment by P. Lanell of all outstanding billings and invoices to date, plus a nonrefundable, non-creditable retainer of $20,000. The Contingent Fee Agreement (CFA) as proposed by Redlich sought a fee of one third (1/3) of all monies recovered, and made no provision for the exclusion of the outstanding offer of $2.55 million that P. Lanell had rejected. In the e-mail, Redlich informed P. Lanell that he had faxed a Complaint to Harvey, i2’s attorney, informing him that he intended to file the same in Massachusetts Superior Court on December 7, if no agreement had been reached by that time. Redlich also told P. Lanell that he would not file the complaint unless P. Lanell paid all outstanding bills to date, plus the additional $20,000 retainer, and signed the Contingent Fee Agreement.
45. On December 7, 2001, i2 preempted Redlich by commencing a civil action in the state court in Dallas, Texas, requesting a declaratory judgment as to the amount of commissions due Lanell (hereinafter the “Texas litigation”). Redlich and P. Lanell did not learn about this suit until January 10, 2002, when P. Lanell received service of process.
46. When Harvey received the “corrected” scorecard from Hooton and Laird in early December 2001, he withdrew the $2.55 million offer. On December 12, 2001, Harvey emailed the “corrected” scorecard in the amount of $1,454,742.50 to Redlich.
47. Harvey testified that P. Lanell’s testimony in his divorce deposition did not have any role in i2’s decision to withdraw the offer. He further testified that he reduced the offer as a result of receiving the “corrected” scorecard from Hooton. This Court credits Harvey’s testimony and finds that the reduction of the offer from $2.55 million to $1,454 million was not the result of any action taken by K. Lanell or her attorney, Legasey, but resulted from P. Lanell and Redlich’s rejection of the $2.55 million offer, and the subsequent preparation of a “corrected” scorecard.
48. On December 14, 2001, Redlich e-mailed plaintiff Lanell, and advised him that i2 seemed to be prepared to pay the $1.454 million rather than settling all claims. He also advised him of his outstanding hourly charges, as well as a calculation of the 5% incentive bonus due under the September 10, 2001 fee agreement. He also informed him that he would have Harvey cut a separate check to him for his fees, incentive bonus, and the $20,000 retainer in the CFA.
49. On December 14, 2001, Kathleen Lanell executed a release in favor of i2 in the Reach and Apply Action.
50. Redlich negotiated with i2 and urged that it pay the $1,454 million to P. Lanell without a settlement agreement or release being signed by P. Lanell. Harvey indicated that he thought this could be done.
51. On or about December 17, 2001, i2 acknowledged and agreed to pay P. Lanell $1,454,742.50 (hereinafter “$ 1.454 million”) — the amount of the “corrected” scorecard, without requiring that P. Lanell or i2 execute a release of any kind, as evidenced both by *693 Harvey’s testimony and by an e-mail from Redlich to Harvey. Harvey also testified that the decision to pay the $1.454 million was his alone and that he was not influenced by anyone outside of i2, and that it was he who decided to pay the money without a release. This Court credits Harvey’s testimony.
52. On the next day, December 18, 2001, Harvey e-mailed Redlich, and asked that Peter and Kathleen Lanell, as well as their respective divorce attorneys, sign a stipulation authorizing the payment of legal fees directly to Redlich, since the monies belonging to the marital estate were being diminished by the attorneys fee portion.
53. The Stipulation that was eventually signed was drafted by the divorce attorneys for Peter and Kathleen Lanell. Redlich inserted the amount of his attorneys fees and the resulting balance to be paid to Boileau as escrow agent.
54. Legasey and his client, K. Lanell, also received a draft Stipulation from Boileau by fax on December 26, 2001. That package included a draft Stipulation of Parties; a copy of the e-mail from Harvey asking for “a signed stipulation/release by Kathleen Lanell and her attorney John Legasey”; and the December 4, 2001 draft of the contingent fee agreement that Redlich had sent to P. Lanell. Legasey and K. Lanell then reviewed the package together.
55. On December 27, 2001, after P. Lanell was advised that i2 would pay $1.454 million without a settlement agreement or release he responded to Redlich’s December 4, 2001 e-mail and his proposed CFA. P. Lanell modified the draft CFA by limiting the 1/3 contingent fee to settlement or damages amounts in excess of the $1.454 million i2 had agreed to pay. This Court finds that P. Lanell’s proposed modification to the draft CFA clearly indicates his discomfort with Redlich’s attempt to assess a 1/3 contingency fee on a settlement already in hand.
56. In response, also on December 27, 2001, Redlich e-mailed P. Lanell with “some further changes and fine-tuning” to Redlich’s December 4, 2001 draft Contingent Fee Agreement, including language indicating that the $1.454 million “which is expected to be paid shortly by i2" would be excluded only if received by Februaiy 28, 2002. In the accompanying e-mail, Redlich stated ”1 defined in a little more detail the exclusion of the anticipated i2 payment of $1.454 million, and set a time limit of Feb. 28, 2002. If they haven’t paid it by then, I think it’s likely that the offer they have made will have fallen through. We are certainly in agreement that if i2 proceeds with what they have represented, i.e. that they are willing to pay you forthwith $1.454 million without a settlement agreement or release, then my fee will be as reflected in our earlier fee agreement letter. On the other hand, if i2 rescinds, or fails to follow through on that representation — and we need to fight with them about the initial $1.454 million — it would come under this new contingent fee agreement." This Court finds that Redlich’s statement, quoted above, is an opinion and not a misrepresentation of material fact nor a fraudulent statement.
57. The further revised CFA stated in part that Redlich’s fee would not exceed “A fee of 33 1 /3% of the gross amount received (in excess of the $1.454 million which is expected to be paid shortly by i2, if such amount is received from i2 on or before Februaiy 28, 2002).”
58. The CFA also required P. Lanell to pay all billings and invoices to date plus an “advance retainer of $20,000 to attorney. It is expressly agreed that attorney shall not be requested or required to reimburse or credit any portion of retainer/attorneys fees received by him during the course of his representation.”
59. In anticipation of the $1.454 million payment by i2, Redlich procured from Peter and Kathleen Lanell and their respective divorce attorneys, a Stipulation (“the Stipulation”) dated December 28, 2001, which provided for Redlich to be paid a fee of $96,243.71 (representing all outstanding hourly invoices plus the 5% “incentive bonus”) in accordance with the September 10, 2001 fee agreement, plus a retainer of $20,000 “to pursue civil litigation against i2 for additional compensation claimed by [Lanell],” with the balance of the monies to be held in escrow for the benefit of the Lanells pending further instructions from the Probate Court or agreement of the parties.
60. P. Lanell signed the CFA on or about December 29, 2001 and returned the executed CFA to Redlich on or about January 1, 2002. The fact that Redlich and P. Lanell executed the CFA on or about this time period is not disputed by any of the parties.
61. At no time did Redlich advise P. Lanell as to whether or not the CFA was in his best interest.
62. On December 27, 2001, Redlich wrote to Boileau, divorce counsel to P. Lanell acknowledging that i2 had agreed to pay the $1.454 million without a release, but that he was going to have to file a lawsuit against i2 to recover the balance of the monies owed Lanell.
63. Redlich testified at trial that, at the time he sent the CFA to Lanell, he did not believe that i2 would make the $1.454 million payment by February 28, 2002. Redlich testified that he knew that the filing of a lawsuit against i2 would delay payment of the $ 1.454 million.
64. On December 27, 2001, Redlich knew that P. Lanell would continue to pursue his claim against i2 for an amount in excess of the $1.454 million.
65. P. Lanell testified that Redlich assured him that the $1.454 million would be paid shortly, and that he relied on the language in the CFA which so stated. This Court credits that testimony.
*694 66. Redlich never told Harvey or anyone else at i2 or representing i2 that i2 had until February 28, 2002 to tender the offered $1.454 million. Further, this Court finds that in fact, neither Harvey, nor anyone else connected with i2 had any knowledge of the February 28, 2002 deadline at anytime prior to or on that date.
67. Since i2 never knew of the February 28, 2002 drop dead deadline and since Redlich knew that the filing of a lawsuit against i2 would delay payment of the $1.454 million, this Court finds that Redlich’s opinion to P. Lanell of the likelihood that the $1.454 million would be paid by February 28, 2002, was unfounded at the time it was made and that the advice was not in the best interests of P. Lanell. Although P. Lanell knew about the February 28, 2002 deadline, he relied on Redlich’s unfounded opinion and advice when he eventually signed the CFA.
68. P. Lanell testified that he understood the December 27, 2001 e-mail to mean that if i2 paid the $1.454 million without a release or settlement agreement, it would not be part of the contingent fee agreement, and that he relied on the language in the e-mail as well as the language in the CFA. I do not credit that testimony. What this Court finds is that P. Lanell understood that if i2 tenders the $1.454 million on or before February 28, 2002, the 1/3 contingency fee provision of the CFA would not apply. Rather, the terms of the September 10, 2001 hourly fee agreement would apply.
69. This Court does not find that the following language of the December 27, 2001 e-mail to be ambiguous: “On the other hand, if i2 rescinds or fails to follow through on that representation — and we need to fight with them about the initial $1.454 million — it would come under this new contingent fee agreement.” P. Lanell’s testimony that it means other than what it plainly says — that if i2 fails to tender the $1.454 million on or before February 28, 2002, the 1/3 contingency fee provision of the CFA would apply — is unreasonable and frankly not credible.
70. The Court also finds that by inserting the February 28, 2002, deadline, Redlich created a conflict of interest with his client. By doing so, he created a fee arrangement which provided a clear disincentive to him to represent his client zealously. The insertion of the deadline was a term which might induce him to improperly curtail services to P. Lanell or perform them in a way contrary to P. Lanell’s interest in order to gain personal financial advantage.
71. In the Texas litigation, i2 did not deny that it owed commissions to P. Lanell. Rather it sought a declaration about how much i2 in fact owed. Thus, Redlich’s efforts in the Texas litigation was not an attempt to collect on the offered $1.454 million.
72. The Court finds that Redlich’s absence of single mindedness and zeal in obtaining payment of the $1.454 million during January and February of 2002 breached his fiduciary duty to his client and renders the CFA unenforceable.
73. On December 31, 2001, Redlich forwarded a bill to Boileau and P. Lanell in the sum of $23,506.59 representing the balance due from P. Lanell for the work performed and expenses advanced pursuant to the September 10, 2001 fee agreement.
74. On January 17, 2002, Redlich forwarded the December 28, 2001 Stipulation, as amended by Redlich to include Redlich’s outstanding fees and expenses through December 31, 2001, to Harvey and requested that a check in the amount of $116,243.71 be paid directly to Redlich’s office along with the balance, less withholding taxes, to be paid to Boileau, as the escrow agent for the benefit of the Lanells.
75. On January 22, 2002, after learning of the Texas Litigation, Redlich demanded that P. Lanell execute a modification of the December 27, 2001 Contingent Fee Agreement in order to provide for the defense of the Texas litigation, and requiring P. Lanell to pay Redlich, as well as local Texas counsel, on an hourly basis for all work performed in that action. The modification also contained a provision that any fees paid to Redlich for work done in the Texas litigation would be applied as a credit to the additional amount due in the event of a recovery pursuant to the terms of the Contingent Fee Agreement, but did not provide an offset for Texas counsel’s fees. The modification is dated January 22, 2002, and was sent to Peter Lanell on or about January 24, 2002. The modification agreement was executed by the parties. The modification to the contingent fee agreement assured Redlich of being paid both hourly and potentially on a contingent fee basis for the Texas litigation, providing him with a guaranteed fee for his services, whether he won or lost. The modification provided that P. Lanell would make his best efforts to have Redlich’s hourly fees attributable to issues of dismissal or change of venue in the Texas suit, paid on a monthly basis. Those fees would then be credited against any eventual contingent fee. P. Lanell signed the Modification on February 5, 2002.
76. This Court finds that Redlich had a pre-existing duty under the terms of the CFA to either defend P. Lanell in the Texas litigation, or to assist him in finding Texas counsel who would defend him in Texas.
77. This Court further finds that by demanding a “modification” to the CFA, Redlich breached his duty thereunder, and was no longer entitled to any benefit under the CFA.
78. Redlich removed the Texas Litigation to the United States District Court for the Northern District of Texas. John McDonald, local Texas counsel, provided Redlich with a copy of a Motion to Dismiss or Transfer previously drafted by his office for Redlich to utilize in connection with the Texas litigation. Redlich incorporated the facts of the Lanell case, updated the legal research, and filed with the Court a Motion to Dismiss for Lack of Personal Jurisdiction and Im *695 proper Venue or, in the Alternative to Transfer Venue to the Massachusetts Federal District Court. Counsel for i2 filed the appropriate oppositions.
79. On January 25,2002, Redlich filed in Middlesex Superior Court the complaint against i2, which he had been drafting since October 2001. i2 removed the action to the United States District Court for the District of Massachusetts (the action is hereinafter referred to as the “Boston Litigation”). i2 subsequently filed a Motion to Dismiss Count III of the Complaint which asserted a claim for violation of G.L.c., 149, §148, the Massachusetts Wage Act, and a Motion to Transfer Venue to the U.S. District Court for the Northern District of Texas. Redlich filed responsive memoranda.
80. On February 1, 2002, Redlich sent a letter to P. Lanell with two bills, “one relating to the Massachusetts litigation (re: i2 Technologies) and the other relating to the Texas action (Texas litigation).” Redlich informed P. Lanell that he would bill him for his and his associates’ hourly time and activities in the Texas litigation, but would not bill him for the time spent in the Massachusetts case. Redlich thereafter issued detailed monthly billings for the work performed in the Texas litigation, and issued monthly statements reflecting the amount of time spent and the expenses incurred in the Boston litigation.
81. On February 15, 2002, Redlich e-malled Harvey as a follow up to the stipulation and Massachusetts complaint previously forwarded to him. In that e-mail, Redlich requested that Harvey advise him of the status of the payment of the $1.454 million. Redlich did not, in this e-mail, advise Harvey that the $1.454 million must be tendered by February 28, 2002.
82. Based on Redlich’s time records and other evidence adduced at trial, this Court finds that other than forwarding the stipulation, the complaint in the Boston Litigation and sending the February 15, 2002 e-mail, Redlich did not speak to or attempt to contact Harvey at any time from December 27, 2001 through February 28, 2002. At no time did Redlich advise Harvey that the payment of the $1.454 million had to be made by February 28, 2002, or that there was any urgency at all to making that payment. This Court further finds that contrary to the aggressive approach he undertook on behalf of Hamel once a tentative agreement with i2 had been reached, Redlich took little action to secure payment of the $1.454 million before Redlich’s artificial February 28, 2002 deadline.
83. i2 did not tender any payment to Redlich or P. Lanell on or before February 28, 2002.
84. As this Court reviews Redlich’s activities between December 27, 2001 and February 28, 2002, this Court finds that the February 28, 2002 deadline inserted by Redlich in the CFA in fact induced him to improperly curtail services to P. Lanell, and that Redlich intended to benefit therefrom by demanding a contingent fee of 1 /3 of the $1.454 million.
85. On March 8, 2002, Harvey on behalf of i2 executed an affidavit that was submitted in the Boston litigation admitting that P. Lanell was owed approximately $1.454 million from i2.
86. On March 8, 2002, Legasey received copies of the December 27, 2001 contingent fee agreement between Redlich and P. Lanell, as executed and the January 22, 2002 modification, in a package of documents from Boileau. Prior to this time, neither Legasey nor K. Lanell had seen the executed version of the December 27, 2001 CFA.
87. On March 18, 2002, i2 admitted in Answers to Interrogatories in the Reach and Apply Action with respect to the $1.454 million payment that “. . . i2 intends to make a payment in this approximate amount for the eventual benefit of Peter Lanell, but does not have a set timeline for doing so. It is anticipated that such a payment will be made in the near future: however, the context and forum of such a payment has not been finally determined at this time.”
88. After receiving the executed CFA on March 8, 2002, Legasey and K. Lanell met with Redlich to discuss the status of the payment of the $1.454 million, the i2 litigation and his fee arrangement with P. Lanell. Legasey expressed his view to Redlich that the contingency fee should not apply to the $1.454 million payment which was expected to be paid without a release.
89. Redlich then filed a Motion to Intervene in the Lanell divorce action to force the release of funds from the marital estate to pay his legal bills for representing P. Lanell against i2.
90. On March 29, 2002, Legasey sent a letter to Redlich advising him he would be filing an opposition to his Motion to Intervene. He also informed Redlich that: “While I expect you to receive an hourly fee for pursuing the $1,500,000.00 [the $1.454 million rounded up] which is on the table, a contingent fee of $500,000.00 for the pursuit of money that is going to be paid sooner or later without any question is, in our view, unconscionable.” Based on this and other evidence adduced at trial, this Court finds that Legasey was willing to agree to release monies from the marital estate to pay for Redlich’s legal services in the i2 litigation as per the December 28, 2001 stipulation and the September 10, 2001 fee agreement.
91. On a quarterly basis, i2 as a public company would provide to its auditors an amount, for purposes of accrual, representing the reasonable estimable amount of i2’s potential liability in legal matters such as the P. Lanell case. As of March 31, 2002, based on Harvey’s recommendation, the accrual on i2’s books for the P. Lanell case was $1.8 million.
*696 92. On April 4, 2002, John Harvey submitted an affidavit in the Texas litigation admitting that Lanell was owed approximately $1.454 million from i2.
93. In the latter part of April 2002, Attorney Tony Avey, counsel to i2 in Texas (hereinafter “Avey”) informed Redlich that i2 was considering depositing the $1.454 million with the Clerk of the Texas Federal Court.
94. Redlich, Boileau and P. Lanell agreed to resend the December 28, 2001 stipulation to Avey in order to convince Avey that there is already an agreement to provide for the distribution of the $1.454 million.
95. On April 30, 2002, Redlich e-mailed Avey suggesting that rather than depositing the money in court, i2 should pay the money pursuant to the December 28, 2001 stipulation previously forwarded to Harvey. In response, Avey requested a copy of the Stipulation.
96. On May 2, 2002, Redlich forwarded a copy of the stipulation to Avey.
97. At no time prior to sending the stipulation to Avey, did Redlich discuss with his client the implications of the February 28, 2002 deadline having passed. He did not advise P. Lanell that he expected to receive a full one-third of the $1.454 million solely because the deadline had passed, although P. Lanell knew that this was the case.
98. On May 6, 2002, after forwarding the December 28, 2001 Stipulation to Avey, Redlich sent P. Lanell a four-page letter advising him of his options available regarding the manner of payment of the $1.454 million, including payment via the stipulation or into the Texas Court registry. In addition to reminding P. Lanell that he still owed him substantial legal fees pursuant to the September 10, 2001 fee agreement and January 22, 2002 modification, he requested that P. Lanell’s divorce counsel file a motion to reconsider an earlier request for fees from the marital estate. He also informed P. Lanell that he was not waiving any rights to his contingent fee as a result of forwarding the stipulation.
99. On May 2, 14, 20, 29, 31, June 1, 3, 5, 6, 12 and 24, 2002, numerous e-mails were exchanged between Redlich and P. Lanell, and between Redlich, Avey and/or Harvey regarding the method to be used for payment of the $1.454 million including but not limited to whether the payment was to be made by check or wire transfer.
100. During the middle of June 2002, Peter and Kathleen Lanell, through their respective divorce counsel, exchanged draft divorce agreements. The draft agreement provided Redlich to be paid his attorneys fees, upon receipt of the $1.454 million, pursuant to the December 28, 2001 stipulation and the September 10 fee agreement. The agreement further provided: “Should Husband’s attorney (Marc Redlich, Esq.) demand additional counsel fees in connection with this i2 payment, the parties shall attempt to reach anagreement with him regarding said fees. In the event there is no mutual agreement regarding the payment of fees, the parties shall engage in binding arbitration with him under the Massachusetts Bar Association Fee Disputes Procedure. If said attorney refuses to enter into the Massachusetts Bar Association Fee Disputes Procedure, the parties shall engage in whatever process is necessary to have a third party, including a court, resolve the fee dispute. Both parties shall act in good faith in an effort to minimize the attorneys fees claimed by the attorney in excess of those amounts set forth in the original Fee Agreement dated September 10, 2001, and the stipulation of December 28, 2001.” This Court finds that this provision was not a conspiracy to deprive Redlich of his attorneys fees to which he was entitled, but a mechanism for the Lanells to pay Redlich reasonable attorneys fees out of the marital estate under circumstances where the amount of the fees were hotly disputed. Redlich knew since at least March 2002, that Legasey, K. Lanell’s divorce attorney considered Redlich’s fee structure under the CFA to be “outrageous.” Redlich also knew from at least December 27, 2001, that P. Lanell was not comfortable with Redlich’s proposal to assess a 1/3 contingency fee on the $1.454 million settlement offer from i2.
101. On or about July 2, 2002, the Texas Court denied Redlich’s Motion to Dismiss and the Motion to Transfer Venue. However, that Court, on its own motion, declined to exercise jurisdiction on the grounds that “the United States District Court of Massachusetts is better situated to adjudicate this dispute,” and issued an Order dismissing the Texas Litigation without prejudice.
102. This Court finds that the Federal District Court in Texas specifically denied the motions filed by Redlich and acted solely on its own motion to defer to the Massachusetts Federal Court for its adjudication.
103. The Federal District Court’s determination was based on the provisions of the Declaratory Judgment Act that a court “may declare the rights and other legal relations of any interested party seeking such declaration ... 28 U.S.C. §2201.” The Court cited to Fifth Circuit cases that have held “that this provision grants district courts broad discretion in choosing whether to exercise jurisdiction over such actions.” The Court then considered six factors to determine whether to exercise jurisdiction over a declaratory judgment action, again citing to Fifth Circuit cases. In doing so, the Texas Court cited only two cases relied on by Redlich in its entire opinion, both of which related solely to the issue of preemption.
Although preemption is one of the six factors, it is not the primary factor relied on by the Texas Court in dismissing the case. In fact, the Texas Court concluded that judicial economy and comity favored dismissing the case under its discretionary powers pursuant to the Declaratory Judgment Act.
104. In his submissions to the Federal District Court in Texas, Redlich did not mention or rely upon the Declaratory Judgment Act, did not cite to the Fifth Circuit cases the Court relied on to use its discretion to dismiss the case, did not refer to the six-point analysis *697 used by the Court, or reference judicial economy and comity anywhere in his briefs. This Court finds that dismissal of the case by the Texas Federal District Court did not result from the arguments advanced by and case law relied upon Redlich, but rather primarily resulted from the Court’s own motion, based on its own analysis of the Declaratory Judgment Act and related cases.
105. Less than three weeks after the dismissal of its case in Dallas, Texas, i2 finally made the $1,454 million payment. On or about Friday, July 19,2002, without requiring a release and pursuant to the express terms of the December 28,2001 Stipulation, is paid, via wire transfer, the sum of $116,243.71 directly to Redlich. Within hours after confirming that his fee had been received by his Bank, Redlich sent an e-mail to Boileau with a copy to P. Lanell threatening to seek court intervention if the balance of his one-third contingency fee in the sum of $396,101.49 was not paid by Monday, July 22, 2002.
106. On the morning of July 23, 2002, at 10:14 a.m., P. Lanell, who had not yet received his portion of the i2 monies, sent an e-mail to Redlich in which he admonished Redlich for his “insensitive and somewhat confrontational” e-mail challenging his divorce attorney and him to “pay immediately or face litigious action.” P. Lanell further challenged the reasonableness of Redlich’s fee agreements. He also advised Redlich that the threatened litigation “could potentially compromise [his] ability to settle [his] divorce or prevail in [his] claim against i2.” P. Lanell then requested that Redlich contact him to discuss “some other arrangement for settlement of legal fees . . .’’
107. After i2 made the $1,454,742.50 payment, K. Lanell refused to allow payment to Redlich of the balance of the one-third of the $1,454,742.50, as provided in the December 27, 2001 CFA.
108. At 12:37 p.m. on July 23, 2002, Redlich forwarded to P. Lanell, Boileau and Legasey, a copy of a Complaint for Declaratory Judgment and Injunctive Relief that he had filed against P. Lanell’s then estranged wife, K. Lanell, to recover fees in accordance with the December 27, 2001 Contingent Fee Agreement, notwithstanding that K. Lanell was not a party to and did not sign the Contingent Fee Agreement. Redlich admits that he read P. Lanell’s earlier e-mail prior to filing the Complaint for Declaratory Relief.
109. This Court finds that P. Lanell notified Redlich that he was challenging the reasonableness of the contingent fee agreement prior to Redlich filing suit against K. Lanell and prior to his termination. This Court also finds that Redlich, by filing suit against K. Lanell over the objection of his client, P. Lanell, who had previously advised him that doing so could compromise his ability to settle the divorce action, created a conflict of interest with P. Lanell, and that as a result, Redlich could no longer represent him.
110. This Court finds that Redlich’s purported reason for filing the Verified Complaint for Declaratory and Injunctive Relief — -namely not to seek damages against K. Lanell, but as a mechanism to freeze and determine, in an expeditious manner, the disputed portion of the i2 funds while the parties’ respective rights were worked out — not persuasive in light of the fact that he did so over the objection of and against the interests of his own client.
111. Shortly after learning of the lawsuit, P. Lanell sent a second e-mail later that afternoon on July 23, 2002 to Redlich terminating him as his attorney, effective immediately due to his inappropriate conduct including the filing of a lawsuit against K. Lanell without the courtesy of a full discussion with him. Based on this and other evidence and testimony adduced at trial, this Court finds that P. Lanell did not act in bad faith when he terminated Attorney Redlich.
112. On July 25, 2002, Redlich sent an e-mail to P. Lanell acknowledging his termination, and that he would take no further action in the Massachusetts Federal Court actions involving i2.
113. Redlich admitted at trial that his filing of the lawsuit against K. Lanell disrupted and interfered with the Lanefl’s divorce negotiations. This Court finds that this is in fact the case. This Court also finds that the Lanells did not execute a final divorce agreement until November 26, 2002. The final agreement provides: “Notwithstanding that legal fees have already been paid to Marc Redlich on the Initial [$1.454million] Payment, any further fees due to Marc Redlich as a result of judgment on the pending fee dispute matter or an agreement by the parties shall also be paid from the Initial Payment with the parties equally responsible for such fees. Upon resolution of [the dispute over the $1,454 million] the balance of the funds shall be divided equally.”
114. In defending the Redlich’s lawsuit, K. Lanell incurred legal fees to Legasey in the early stages of this litigation, of $18,025.00, in addition to the fees of her current counsel.
115. On July 25, 2002, Peter and Kathleen Lanell as well as their respective divorce counsel together with Redlich agreed to place the sum of $400,000 from the monies received from i2, in escrow (which has now been deposited with interest in the Superior Court).
116. Shortly thereafter, Peter and Kathleen Lanell, through their respective divorce counsel offered to submit the fee dispute to the Massachusetts Bar Association Fee Arbitration Board. Redlich refused.
117. During the course of Redlich’s representation of Lanell, he issued detailed monthly billing statements for the work he performed. Each statement contained a description of the work by Redlich and his associates, the amount of time spent, the charge for each entry, the amount and charge for disbursements, and the total bill with amounts credited for payment.
*698 118. For the period of September 4, 2001 through October 31, 2001, Redlich rendered monthly statements for services to Lanell and Hamel to be shared equally. Thereafter, Redlich issued separate bills to Lanell. All of these services were billed at an hourly rate pursuant to the September 10, 2001 fee agreement. As of December 31, 2001, Lanell owed Redlich the sum of $23,506.59 pursuant to the September 10, 2001 fee agreement.
119. Commencing with the February 1, 2002 billing statement, Redlich issued separate bills for the work performed and expenses incurred in the Texas litigation based on the January 22, 2002 modification agreement to the CFA, and the Boston litigation pursuant to the December 27, 2001 contingent fee agreement. With respect to the Boston litigation, Redlich tracked his time, but did not bill P. Lanell for anything other than expenses incurred.
120. For the period from January 10,2002 through July 16, 2002, Redlich billed P. Lanell for 245.10 hours of time spent and expenses incurred in the Texas litigation for a total of $81,848.24. Redlich acknowledged that he billed P. Lanell for numerous hours that clearly were not related to work performed in the Texas litigation. Additionally, Redlich admitted that he had over billed P. Lanell $20 per hour, resulting in a credit to P. Lanell of $4,902.
121. On July 19, 2002, Redlich received a wire transfer from i2 in the amount of $116,243.71. That sum reflected the terms of the December 28,2001 Stipulation of Peter and Kathleen Lanell wherein they acknowledged that Redlich should be paid the sum of $96,243.71 under the terms of the September 4, 2001 hourly agreement, and a retainer of $20,000 to pursue additional litigation.
122. This Court finds that Redlich is entitled to an additional 5% incentive bonus based upon the September 10, 2001 fee agreement.
123. Redlich’s invoices show that he charged P. Lanell the following for services rendered: $29,257.00 for services between September 1, 2001 and December 31, 2001; 2) $72,700.00 for the five percent bonus; 3) $81,848.00 for actual billings in the Texas litigation; 4) $44,898.00 based on actual hours worked in the Massachusetts litigation; and 5) $365.00 for one hour for Redlich’s services in providing the Superior Court opinion to the federal court in August of2002. The total due for services then is $229,068.00. P. Lanell has paid: 1) $ 1,250.00 in September of2001; 2) $5,000.00 in October 2001; and 3) $116,243.71 in July of 2002. Taking into account these invoices and credits, as measured by actual hours worked and fees incurred, Redlich is entitled, under a quantum meruit theory, to a fee of $106,574.29 from P. Lanell for services rendered.
124. I find that while rendering services pursuant to the September 10, 2001 hourly fee agreement, Redlich obtained an offer by i2 to pay P. Lanell the sum of $1,454 million without a settlement agreement or release. I find that Redlich was paid in full for those efforts on July 19, 2002.
125. This Court finds that once i2 agreed to pay the initial $1,454 million in December 2001 without a release, although payment was delayed, it never rescinded or withdrew its offer to pay that money without a release. This Court finds further that during April and May 2002, i2 negotiated the method of payment of the $1,454 million. And, this Court further finds that in June 2002, prior to the decision of the Texas Federal Court, i2 was preparing to and intended to pay the $1.454 million, and in fact paid it in July 2002 without a release.
126. Redlich testified that his work in Texas “precipitated” the i2 payment. He further testified that his work in the Boston Litigation was intended to “keep i2’s feet to the fire” with regard to the $1,454 million payment. However, this Court finds that Redlich’s efforts in the Texas litigation were not the basis of i2’s payment of the $1,454 million. This conclusion is supported by Harvey’s testimony, that the two events were not related. Even the Texas Court’s decision references the fact that i2 had acknowledged owing P. Lanell the $1.454 million. This Court further finds that the services rendered in Texas were provided pursuant to an hourly billing agreement as specified in the Modification to Contingent Fee Agreement dated January 22, 2002. This Court finds that Redlich was paid in full for those services on July 19, 2002.

B. Marc Redlich v. Peter Lanell and Steven E. Ernstoff

In addition to the Findings above, this Court hereby makes the following findings of material facts:
1. Shortly after learning of the lawsuit that Redlich had filed against K. Lanell, P. Lanell sent an e-mail that afternoon on July 23, 2002 to Redlich terminating him as his attorney, effective immediately due to his inappropriate conduct including the filing of a lawsuit against K. Lanell without the courtesy of a lull discussion with him.
2. On July 25, 2002, Redlich sent an e-mail to P. Lanell acknowledging his termination, and that he would take no further action in the Massachusetts Federal Court actions involving i2.
3. On August 19, 2002, Redlich sent a letter to Judge Wolf of the Massachusetts Federal District Court with a copy of the recent decision of Superior Court Judge Gants in to Lohnes v. Darwin Partners, Inc. [Lohnes v. Darwin Partners, Inc., No. 021299, 2002 WL 31187688 (Mass.Super.Ct. July 23, 2002)], (15 Mass. L. Rptr. 157) concerning the Wage Statute as applied to commissions as well as a recent article from Massachusetts Lawyers Weekly discussing the wage statute generally. The letter simply referenced the enclosed documents, and did not include any arguments as to the applicability or impact of Lohnes on P. Lanell’s claim.
4. On September 30, 2002, the accrual on i2’s books for the P. Lanell case, after payment of the $1.454million, was adjusted down to $0, based on Harvey’s opinion that no additional monies would be owed to P. Lanell.
*699 5. Redlich filed a Motion to Withdraw from the Boston Litigation, which was allowed after P. Lanell’s new counsel, Steven E. Ernstoff (hereinafter “Erastoff j filed an appearance. Prior to filing his appearance, Ernstoff entered into a contingent fee agreement with Lanell providing for attorneys fees of one-third of any additional recovexy received from i2.
6. Ernstoff, up until the time he represented P. Lanell, had never represented a plaintiff in a Wage Statute case and could not recall representing anyone in an employment or sales commission case. Nor had he ever handled an appeal before the 1st Circuit U.S. Court of Appeals, or before a panel of the Supreme Judicial Court or the Massachusetts Appeals Court.
7. On November 13, 2002, a hearing was held in the Boston Litigation before Judge Wolf on i2’s Motion to Dismiss Count III of the Complaint. The motion was presented by Ernstoff on behalf of P. Lanell. Judge Wolf denied the Motion to Dismiss, without prejudice, to be renewed at a later date as a “fully supported Motion for Summary Judgment.” The Court then set out a discovery schedule for the parties.
8. During the hearing, Judge Wolf made remarks as to his tentative analysis regarding the applicability of the Wage Statute to Lanell’s claims. He stated that the “Lohnes decision, a Superior Court decision applying the Wage Act to commissions, at the moment appears persuasive and favors not dismissing.” In his remarks, Judge Wolf relied heavily on the rationale set out in Lohnes. He also made it clear that his tentative view was not “the law of the case status,” and that he intended to revisit the issue at summary judgment. In this regard, Judge Wolf stated “this is a hot issue ... we may very well have Massachusetts Appeals Court’s decisions on this or the SJC decisions in the ordinary course without certifying it before we get to the summary judgment or trial stage.” He further stated "... that in its present posture you’ve got a collision of thoughtful cases. You know it’s possible that discovery will demonstrate even undisputed facts that are different than the facts alleged in the complaint.” He concluded by saying “if there’s a motion for summary judgment and I find there are no disputed facts, but the law appears to be sufficiently uncertain, that at that point I would certify a question.”
9. Judge Wolf, in his remarks, made no reference to any of the out of state cases cited by Redlich in his memorandum. Nor did he render a definitive ruling as to the applicability of the Wage Act to Lanell’s commissions. Although this Court cannot read minds, it appears from Judge Wolfs comments, recorded in the transcript of the hearing, that he was uncertain how he would decide the issue, although the Lohnes decision did influence his thinking. It is quite likely that Judge Wolf, being a careful jurist, did read Redlich’s earlier filed memorandum of law as well as the Lohnes decision. However, there was no comment or statement or reference in the transcript to suggest that Judge Wolf was relying on any memoranda or cases other than the Lohnes decision when he made his comments about the applicability of the Wage Act. Thus it appears to this Court that the memorandum, which was submitted by Redlich, prior to the issuance of Judge Wolfs decision denying the i2’s Motion to Dismiss Count III, did not significantly contribute to the remarks of and the decision of Judge Wolf.
10. In these circumstances, this Court further finds and rules that Redlich’s providing Judge Wolf with copies of the Lohnes decision and the Lawyers Weekly .article on the Wage Statute was no different than what would be expected from any competent and responsible lawyer in his position, and he is not entitled to any additional compensation other than for the hour or less that it would have taken him to read and have his secretaiy send the decision to Judge Wolf.
11. On November 13,2002, at the same hearing before Judge Wolf on i2’s Motion to Dismiss Count III of the Complaint, Redlich’s motion to withdraw was allowed.
12. On November 22, 2002, Redlich served and caused to be filed in the Boston Litigation a Notice of Attorney’s Lien for his fees citing G.L.c. 221, §50, “representing thirty-three and one-third (33 1 /3%) percent of any recovery obtained by Peter Lanell, plus reasonable expenses, upon the causes of action of Peter Lanell against the defendant or its affiliated entities.”
13. As no discovery had been conducted by Redlich in the Boston Litigation, Ernstoff and i2 exchanged initial disclosures and produced documents in accordance with the Federal Rules and the discovery schedule set by Judge Wolf.
14. On December 31, 2002, the accrual on i2’s books for the P. Lanell case was increased to $500,000.00 based on Harvey’s assessment of a totality of circumstances, including the departure of a key witness from the company, i2 having to begin responding to discovery requests from Ernstoff, and i2 focusing its attention on the facts underlying P. Lanell’s claim, and his determination that it would take “another $500,000.00 to make Peter Lanell go away.” Harvey testified that if he “thought that Judge Wolfs decision [in reference to the Wage Statute] made the ultimate outcome reasonable and estimable in terms of trebling the original amount, this accrual would not have been $500,000.00. It would have been closer to $3 million.)’’
15. The parties were also required by the Federal District Court to meet prior to the end of January 2003 to discuss the possibility of settlement. Prior to scheduling the meeting, Ernstoff engaged in further informal discovery, requesting specific documents which he believed were necessary to a productive settlement conference. i2 produced some additional documents prior to the settlement conference. On January 30, 2003, the parties including Harvey, on behalf of i2, met as required, in an attempt to settle the matter. The parties were unable to settle the case, but agreed that additional *700 documents had to be produced by i2 in order to make any future settlement discussions meaningful.
16. Between January 31 and August 5, 2003, Emstoff made numerous requests, both formal and informal, for documents regarding each of the deals in which P. Lanell might be entitled to a commission and other relevant documents required to determine the total commissions owed, including various accounting calculations. During this period, i2 produced in excess of 10,000 documents, all of which had to be analyzed by Emstoff and his associates. Many of the documents contained detailed information involving complex contractual obligations, product and price allocations and accounting procedures.
17. On March 31, 2003, i2 increased its accrual for the P. Lanell case to $1,250,000.00 based on Harvey’s concerns about the availability of certain witnesses for trial, ongoing discovery issues, the continued employment of Emily Hooton and the viability of the $1.454 million-scorecard she had created in December 2001, and developing details about the underlying case.
18. Emstoff also deposed numerous past and present i2 employees and i2’s expert between April and August 2003. The depositions took place in Boston, Dallas and Newark. Emstoff also defended depositions conducted by i2 of P. Lanell and experts retained for his case.
19. Over the course of his representation of P. Lanell, Ernstoff also enlisted the assistance of Attorneys Christopher McHallam and Lisa DeBrosse Johnson in order to conduct discovery and prepare substantive motions to be filed.
20. Emstoff and P. Lanell created numerous scorecard scenarios from the documents received and deposition testimony taken in an effort to show the total amount of commissions due P. Lanell.
21. Ernstoff also organized and provided thousands of pages of documents to his principal expert, Robert G. Rice, C.P.A., in order to assist him in auditing the relevant scorecards, and preparing two detailed reports reflecting the various deals in which P. Lanell was entitled a commission, and the calculation of each commission. Rice’s reports indicated that P. Lanell was owed commissions, in addition to the $1.454 million previously paid by i2, in an amount ranging from $2.4 million to $8.9 million.
22. On June 3, 2003, Emstoff met with Harvey for the entire day in an attempt to settle the Boston Litigation. Harvey offered $750,000 in settlement. Harvey was aware that Emstoff was seeking a settlement in the $3.5-$4.5 million range, and Ernstoff made it clear to Harvey that he needed to cross the $2 million threshold to get movement from P. Lanell. They were unable to reach an agreement.
23. On June 5, 2003, Ernstoff filed a Motion for Partial Summary Judgment on Count III of Plaintiffs Amended Complaint with supporting memoranda and documentation, claiming that all commissions due and payable to P. Lanell including but not limited to the $1.454 million previously paid, were subject to the provisions of the Massachusetts Wage Act including triple damages and attorneys fees. i2’s attorneys, Skadden Arps, filed a Memorandum in Opposition to the motion, and Emstoff filed a Reply Brief.
24. On June 5,2003, Ernstoff filed a Motion for Leave to Amend the Complaint to add i2’s CEO and CFO as Defendants pursuant to the Massachusetts Wage Statute and to add i2 US as a defendant, with a supporting memorandum. i2’s attorneys filed an opposition together with supporting documentation, and Emstoff filed a Reply Brief and Supplemental Documentation.
25. On June 25, 2003, i2’s attorneys filed a Motion for Leave to Amend Answer and Assert Counterclaims against P. Lanell together with supporting documentation, arguing for the first time that P. Lanell should not have been paid the $1.454million, and as a result, owed i2 money. Emstoff then filed a Memorandum in Opposition to i2’s motion, in response to which i2 filed a Reply Brief.
26. On August 8, 2003, i2 filed a Motion for Summary Judgment including but not limited to the issue of the applicability of the Massachusetts Wage Statute to the P. Lanell case. Emstoff filed a Memorandum in Opposition to i2’s motion, in response to which i2 filed a Reply Brief.
27. In September 2003, Rob Bearden, P. Lanell’s former supervisor contacted P. Lanell directly and met with him to discuss settlement. As result of that meeting, the parties agreed to mediate the case.
28. On September 30,2003, i2 increased its accrual for the P. Lanell case to $1,720,716.00 based on the deposition testimony of Rob Bearden (taken July 10, 2003), Harvey’s continued concerns about the ability of Emily Hooton to defend her position on the $1.454 million scorecard, documents that indicated a “process breakdown within i2 that would make it difficult to advance [i2’s] position.”
29. On October 30, 2003, P. Lanell and his attorneys, and Harvey, Bearden, Robert Donahoo, i2’s Sr. V.P. and General Counsel and i2’s attorneys from Skadden Arps met with the Honorable David Mazzone in an attempt to mediate a settlement. Although the mediation was not successful, the parties subsequently continued settlement discussions at the offices of i2’s attorneys. These negotiations did not result in a settlement.
30. In the latter part of December 2003, Emstoff and Harvey again discussed settling the case. After extensive negotiations, the parties agreed to settle the Boston Litigation for an additional payment of $2,599,990.00 (“January 14,2004 Settlement Agreement”), bringing the total P. Lanell settlement with i2 to $4,054,732.50. The parties entered into a Confidential Settlement and General Release Agreement dated January 14, 2004.
31. At the time of the settlement the various motions filed by the parties and referenced above, were still pending and awaiting hearing before Judge Wolf.
32. From the time Redlich was terminated as the attorney for P. Lanell until the final settlement of the *701 case on January 14, 2004, i2 Incurred attorneys fees from Skadden Arps of $911,792.00 in defending the Boston litigation.
33. Harvey testified, and this Court credits this testimony, that i2’s decision to settle the case was based on a totaliiy of factors. At the forefront was the litigation being fueled by Emstoff and the resulting costs to i2 including mounting legal fees and manpower required to continue defending the case. There were also tangible and intangible factors known only to the company as well as a pending class action and other litigation. Harvey also considered the company’s exposure to P. Lanell recovering not only actual damages if Emstoff was successful in persuading a jury that his scorecard was accurate, but treble damages as well, in the event the Wage Act was found to be applicable. On that issue, he testified he was prepared to go to the Massachusetts Appellate Courts to show that the Wage Statute was not applicable.
34. Harvey also testified that the payment of $2,599,990.00 had “nothing to do with” doubling the original $1,454 million payment. Harvey further stated that Redlich’s work had “zero” impact on i2’s decision to pay $2,599,999 [sic]. This Court credits this testimony as well.
35. This Court finds that Harvey’s testimony as to the reasons for the ultimate settlement of $2,599,990.00 to be credible, and that Redlich’s work in the Boston litigation was preliminary in nature and did not contribute to the final settlement of $2,599,990.00. This Court further finds that even if the December 27, 2001 CFA were enforceable, which this Court finds that it is not, Redlich did not render substantial performance under its terms to be entitled to any attorneys fees relative to the $2,599,990.00 settlement.
36. The January 14, 2004 Settlement Agreement as executed by the parties provided for payment of the sum of $866,663.33 as attorneys fees to Ernstoff. That money is currently held in escrow by Emstoff pursuant to an order issued by this Court.
37. Ernstoff never made any representations to Redlich or accepted any responsibility for payment of Redlich’s legal fees to him for his representation of P. Lanell.
38. Ernstoff and his associates have submitted time records reflecting almost 1,500 hours spent representing P. Lanell against i2 after Redlich’s termination. This Court finds that Ernstoff and his associates spent a substantial amount of time between October 2002 and January 2004 working on P. Lanell’s case, developing the factual underpinnings and legal bases for his claims, and ultimately, securing i2’s agreement to pay P. Lanell an additional $2,599,990.00 over and above the undisputed commissions of $1,454,742.50 obtained by Redlich. I find the work performed by Ernstoff and his associates was reasonable and necessary and lead to the final settlement.

III. BACKGROUND

The central issues in this case are whether the December 27, 2001 modifications of the September 10, 2001 attorney fee agreement between Redlich, an attorney, and P. Lanell, his client, converting an hourly based fee agreement into a contingent fee arrangement is enforceable; whether Redlich is entitled to any attorneys fees from P. LaneU’s second settlement because of work performed by Redlich before the attorney-client relationship ended; and whether K. Lanell did anything to interfere with Redlich’s attorney fee agreement with P. Lanell.
The changes to the attorney fee agreement draw the Court’s attention because the “new” fee results in a significant economic advantage to the attorney at the expense of the client. Though the law recognizes that the practice of law is a business, fee agreement contracts between attorneys and clients are not enforced on the same basis as ordinary commercial contracts because of the fiduciary relationship between attorney and client. Malonis v. Harrington, 442 Mass. 692, 702 (2004); Pollock v. Marshall 391 Mass. 543, 556-57 (1984); See Restatement (Third) of the Law Governing Lawyers §16 cmt. c (1998) (distinguishing attorney client relationship which exists for benefit of client from a partnership entered for mutual profit).
Because of the seriousness of the consequences of this Court’s decision in this matter and because this Court respects the professionalism and competence of all counsel involved in this matter,[5] the following lengthy discussion of the relevant ethical principles governing the high fiduciary duty of attorneys toward their clients, especially in the area of fees, is warranted.

A. Fiduciary Duty of an Attorney

Massachusetts courts consider the relationship of attorney and client “highly fiduciary” in nature and requires an “[u]nflinching fidelity” to the client’s interests. Polock, 543 Mass, at 555 (quoting Berman v. Coakley, 243 Mass. 348, 354 (1923)); Opert v. Mellos, 415 Mass. 634, 638 (1993) (citing Hendrickson v. Sears, 365 Mass. 83, 90 (1974). Within the relationship, the attorney is an expert, like a doctor, owing the client a duty of full disclosure of the facts material to the client’s interest. Hendrickson, 365 Mass. at 90. For this reason, the court holds attorneys to a high standard and frowns on behavior that “indicates a greater interest in [the attorney’s] personal financial welfare than in his professional conduct in relationship to both his clients and the court.” McInerney v. Massasoit Greyhound Association, Inc., 359 Mass. 339, 354 (1971) (quoting State ex rel. Nebraska State Bar Assn. v. Richards, 165 Neb. 80, 89 (1957)).
The “highly fiduciary” nature of the relationship assumes even greater importance once the attorney client relationship is established because the attorney has gained the client’s trust. Pollock, 391 Mass. at 556. A change in the terms of the attorney-client relationship after representation has begun should be viewed with special scrutiny because: 1) the client has become de *702 pendent on the attorney’s integrity and fairness; 2) a change in representation could impose a financial and emotional burden on the client; 3) the client may fear the lawyer’s resentment if he refuses the change; and 4) the client’s belief that the changes promote his position. See Salem Realty Co., 10 Mass.App.Ct. 571, 575 (1980) (discussing unfairness of forcing client to choose between adherence to a lawyer in whom he lost faith or risking more fees); see Restatement (Third) of the Law Governing Lawyers § 18(a), CMT. e (1998) (discussing inherent burdens of changing attorneys during representation); Spilker v. Hankin, 188 F.2d 35, 39 (D.C.Cir. 1951) (noting attorney’s strong influence over client after inception of attorney client relationship). A lawyer, on the other hand, usually has no justification for failing to reach a fee agreement at the inception of the relationship and generally little justification for having a pressing need to modify the fee agreement during it. Unlike the client, the lawyer has both the opportunity and the sophistication to propose appropriate terms at the outset. Restatement (Third) of Law Governing Lawyers §18 cmt. e. In proposing the fee agreement, the attorney presumably would have taken into account the anticipated risks and costs of representing his client.
The Massachusetts Rules of Professional Conduct[6] express the principle of an attorney’s limited ability to alter a fee agreement with a client. For example, Mass.R.Prof.C. 1.16 governs termination of the attorney-client relationship, an issue implicit in any attempt by counsel to change the terms of a fee agreement during the course of the attorney-client relationship. In relevant part, Mass.R.Prof.C. 1.16 permits an attorney to withdraw when it can be shown that the withdrawal can be accomplished “without material adverse effect” on the interests of the client or if “the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer’s services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled”.[7] The client, on the other hand, maintains the right to change his lawyer at any time “for any cause or no cause at all.” Salem Realty Co. v. Matera, 10 Mass.App.Ct. 671, 575 (1980) (“A client’s right to change his lawyer at any time for any cause or no cause at all is inherent in the characteristics of trust and confidentiality in the lawyer-client relationship”).
The restrictions on withdrawal are based in part on familiar principles of contract law. As a threshold issue, all contract modifications must be “fair and equitable in view of circumstances not anticipated by the parties when the contract was made.” Restatement (Second) of Contracts §89(a) (1981). In addition, contract modifications must be supported by consideration. Tri-City Concrete Co., Inc. v. ALA Construction Co., 343 Mass. 425, 427 (1962). “The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. ” Fall River Hous. Tenants v. Fall River Hous., 15 Mass.App.Ct. 992, 993 (1983) (citing Marine Contractors Co. v. Hurley, 365 Mass. 280, 286 (1974).[8] “If the parties to a bilateral contract agree to rescind or modify it, there is no difficulty in regard to consideration . . . The promise of one party to forego his rights under the contract is sufficient consideration for the promise of the other party to forego his rights.” Williston on Contracts (Rev. ed.) §1826. But “(p)erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration.” Restatement (Second) of Contracts §73. Thus Rule 1.16 governing withdrawal imposes a restraint on an attorney’s ability to provide consideration but the client does not face a similar “legal duty” restraint.
Accordingly, courts take a dim view of changes in fee agreements between lawyers and clients, particularly changes that have the effect of benefiting the lawyer. Pollock, 391 Mass. at 555. Some jurisdictions have held that such agreements are void. Spilker, 188 F.2d at 39. Other states invalidate such fee agreement contracts on the grounds of fraud and shift the burden to the attorney to show the fairness of the transaction in that the compensation does not exceed a reasonable compensation for services rendered. Id. Other jurisdictions have concluded that these types of changes are attended by a presumption of invalidity. Id. The skepticism is rooted in the public policy of protecting a client against the strong influence of an attorney. Id. The public policy concern “operates independently of any ingredient of actual fraud or of the age or capacity of the client, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise.” Id. (emphasis added). Though the Massachusetts courts have not adopted an explicit position regarding when changes are permitted in an attorney/client fee agreement, a synthesis of common-law principles and the Massachusetts Rules of Professional Conduct indicate that at a minimum, an attorney must show the fairness of the transaction in “all respects.” Pollock, 391 Mass. at 555; S.J.C. Rule 3:07, Preamble and Scope cmt. 8. Further, the changes obviously must be in the client’s — not the attorney’s — -best interests because of the “highly fiduciary” nature of the relationship.
A fundamental issue in the fairness of a transaction between an attorney and client is the reasonableness of the fee itself. Mass.R.Prof.C. 1.5, which prohibits “clearly excessive fees,” provides a framework to analyze the reasonableness of all fees charged by an attorney. Mass.RProf.C. 1.5(a) lists eight factors to be considered in determining whether a fee is clearly excessive: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experi *703 ence, reputation and ability of the lawyer or lawyers performing the services: and (8) whether the fee is fixed or contingent. In addition, Mass.RProf.C. 1.5(b) requires disclosure of the basis for a fee and Mass.RProf.C. 1.5(c)(d) and (f) govern contingent fees. Massachusetts courts, relying on these rules as adopted in SJC Rule 3:07, have refused to enforce fee agreements deemed “excessive and unreasonable as a matter of law.” McInerney v. Massasoit Greyhound, Association, Inc., 359 Mass. 339, 351 (1971) (citations omitted).
Though these rules apply to all fees, contingency fees raise special considerations because of the potential for excessive fees. Among the special considerations in the case of a contingency fee are: 1) the likelihood of success; 2) the likely amount of recovery; 3) the possibility of an award of exemplary or multiple damages; 4) the attitude and prior practices of the other side with respect to settlement; 5) the likelihood of, or any anticipated difficulties in, collecting any judgment; 6) the availability of alternative dispute resolution as a means of achieving an early conclusion to the matter; 7) the amount of time that is likely to be invested by the lawyer; 8) the likely amount of the fee if the matter is handled on a non-contingent basis; 9) the client’s ability and willingness to pay a non-contingent fee; 10) the percentage of any recovery that the lawyer would receive as a contingent fee and whether the percentage will be fixed or on a sliding scale; 11) whether the lawyer’s fees would be recoverable by the client by statute or common law; 12) whether the jurisdiction has guidelines for contingent fees; and 13) how expenses of the litigation are to be handled. ABA Formal Op. 150 (1994).[9] In analyzing these factors, the overriding concern is whether the contingent fee is “consistent with the client’s best interests.” ABA Informal Op. 86-1521. Though the ABA ultimately concludes that as a general proposition contingent fees are appropriate and ethical in situations where liability is certain and some recovery likely, it warns of special situations in which a contingent fee may not be appropriate such as when a lawyer is reasonably confident of a settlement offer and the risk of non-recoveiy is low. Id. (emphasis added).
In Massachusetts, courts examine the reasonableness of the contingent agreement both at the inception of the contract and as a matter of hindsight McInereny, 359 Mass. at 353. Consequently, a contingent fee agreement resulting in an exceptional fee may withstand the reasonableness test if the risk of non-recovery at the outset of the contract is sufficiently high. ABA Formnal Op. 150 (1994). Conversely, when there is no significant uncertainty in the client’s recovery a contingent fee that amounts to a significant percentage of recovery should be condemned as unreasonable. See e.g. Committee on Legal Ethics it Patterson, 353 S.E.2d 107, 113-14 (W.Va 1986).
Besides examining the fee itself, the court examines whether the client’s decision to agree to such a fee structure was an informed one. The Massachusetts Rules of Professional Conduct include the duly to advise a client to the extent reasonably necessary to permit the client to make informed decisions about the representation. Malonis, 442 Mass. at 700-01; Mass.RProf.C. 1.4(b). Matters impacting a client’s best interest require “express discussion.” Id. at 701-02. If a transaction between a client and attorney is called into question, the burden is on the attorney to prove that any influence over the client, which might be presumed to have arisen out of the relationship, was neutralized by independent advice or by some other means so that there was no overreaching of the client and no abuse of confidence. Pollock, 391 Mass. at 556-57. Whether the attorney sustains that burden, depends on the facts of each case. Id.
It is under the foregoing principles, then, that this Court considers whether the fee agreement modifications Redlich seeks to enforce against his former client, P. Lanell, are fair in “all respects” and otherwise conform with the high fiduciary duty he owes his client. Pollock, 391 Mass. at 555.

IV. DISCUSSION

A. Marc Redlich v. Kathleen LaneR and Peter LaneR 1. The December 27, 2001 Fee Agreement Modification Resulting in the CFA

The fee agreement modification of December 27, 2001 that created the Contingent Fee Agreement at issue, benefits Attorney Redlich in a significant way and deserves heightened scrutiny. Prior to the change, the fee agreement between the two parties of September 10, 2001 required Redlich to be paid on an hourly basis plus a five percent bonus if a resolution were reached prior to December 15,2001.[10] At the time the parties signed the CFA on December 31, 2001, P. Lanell had; 1) paid Redlich $6,250.00, consisting of $1,250.00 retainer paid in September 2001 and $5,000.00 in October 2001, which had been released from the probate estate; and 2) owed Redlich $95,707.00 in unpaid fees ($23,007[11] for hourly services and fees and $72,700 for the five percent bonus based on the i2’s $1,454 million offer). By the terms of the December 27, 2001 CFA, Redlich stood to earn one-third of the $1454 million, or approximately $484,182.00 if payment was not received by February 28, 2002. At the outset of the new agreement, then, the difference represents a fourfold increase in the value of the fee agreement to Redlich if i2 failed to tender the $1,454 million by February 28, 2002.

a. Fairness of the Formation

Redlich offers thin justification for changing the fee agreement to the degree and extent that he did. Redlich points to a couple of factors that, in his view, justified converting the hourly fee agreement to the CFA. First, Redlich justifies the change to a CFA based on the probate court’s freezing of P. LaneU’s assets as a result of the divorce proceedings and second that the litigation against i2 might escalate. The problem with Redlich’s justification is that he knew from the inception of the attorney/client relationship with P. Lanell that the divorce was hotly *704 contested. As Redlich readily admits, “(t]he Lanell’s divorce was unusually contentious from the beginning.” In fact, at the time that P. Lanell initially retained Redlich, the divorce action was about a year old, with a number of filings clearly evidencing the contentiousness of the parties. Redlich, an experienced attorney, should have known that given this particularly difficult divorce case, it was likely that accessing assets would be challenging to P. Lanell. Further, it would be surprising to this Court that Redlich did not know or at least presumed that P. Lanell’s unpaid commissions would be a central part of the marital estate and a bitter bone of contention between the parties. As an “expert,” Redlich, in setting the terms of the September 10, 2001 fee agreement, should have bargained for the risk that P. Lanell’s divorce proceedings would interfere with his ability to pay at the outset. Hendrickson, 365 Mass. at 90.
One difficulty with Redlich’s insisting on converting the hourly fee plus bonus agreement to the CFA is that coming in the middle of negotiations with i2, P. Lanell was placed in a very awkward position. If P. Lanell refused to assent to the CFA, then he risked Redlich’s withdrawal from the case. For P. Lanell to change attorneys in December 2001 would have been potentially harmful to his case. At the time of the contract modification, the negotiations between Redlich and i2 were at an advanced stage with i2 having offered $1.454 million based on a self-audit and, surprisingly, without requiring a release or a settlement agreement from P. Lanell on the remainder of his claim — a remarkable offer indeed. Changing attorneys with such a generous offer on the table would weaken P. Lanell’s bargaining position significantly by sending a signal of uncertainly to opposing counsel. Given the time it would take for new counsel to get up to speed on the case, it would have guaranteed that any payment would have been delayed significantly or, worse, the offer would be withdrawn all together. Further the delay would have the potential of diminishing P. Lanell’s overall position. P. Lanell would, under these circumstances, feel compelled to agree to the CFA, even though unfavorable to him, because of the risks to his litigation against i2 if he had to replace Redlich.
It is true that Redlich never intimated to P. Lanell that he would withdraw unless P. Lanell agreed to the CFA. He did not have to. With the $1,454 million dollar settlement offer sitting on the table, P. Lanell, as would any client, would be loath to change attorneys in midstream. The reality is that Redlich would not have been able to withdraw from the case at that time. In order for Redlich to permissively withdraw in these circumstances, he would have to show that withdrawal would not have had a “material adverse effect” on his client’s case or that P. Lanelle “fail[ed] substantially” to honor his obligations under the contract. Mass.RProf.C. 1.16(b), 1.16(b)(4), 424 Mass. 1814 (1998). As indicated above, a withdrawal would almost certainly had a “material adverse effect” on P. Lanell’s case.
With respect to the second element, Redlich could not justify withdrawal based on P. Lanell’s compromised financial position. Though a lawyer may withdraw if a client “fails substantially” to abide by the terms of an agreement relating to representation, the financial difficulties experienced by P. Lanell do not rise to that level. Redlich’s claim as to the severity of the financial strain is undermined by his requirement in the second modification of January 22, 2002 that P. Lanell “make [his] best efforts to have [the Texas bills] paid out of the divorce escrow fund, whether by agreement ... or by having your divorce counsel file a motion for payment of our Texas litigation fees out of the escrow fund; but in any event you will be responsible for paying the Texas litigation fees in timely manner.” Moreover, the financial difficulty was foreseeable at the inception of the contract in September of2001, and there were various remedies available including petitioning the probate court for release of monies from the marital estate or simply awaiting a short period of time for payment on the $1.454 million.
In light of Redlich’s duty to advise P. Lanelle “to the extent reasonably necessary to allow an informed decision,” the evidence indicates that Redlich did not adequately advise P. Lanell as to the material consequences of changing the fee agreement to the CFA, especially regarding the potential effect of the February 28,2002 deadline and the fact that Redlich did not advise i2 that it had until the February 28, 2002 deadline to tender payment. Malonis, 442 Mass. at 700-01. For example, Redlich did not “explicitly” inform P. Lanell about the legal mechanism of petitioning the probate court to release funds despite using this tool in October 2001 to release $5,000 and attempting to use it again in December 2001 to secure the $20,000 non-refundable retainer fee. Malonis, 442 Mass. at 701-02. Though P. Lanell, an experienced businessman, could understand the overt economic aspects of the change and perhaps would have understood the legal aspects of petitioning the probate court, he would not have understood the subtleties of Redlich’s professional duty to maintain the integrity of the original contract and it is clear that Redlich did not inform him of those constraints.
In response, Redlich claims that P. Lanell’s access to his divorce counsel neutralized any failure on Redlich’s part to make material disclosures. Though accepting advice from independent counsel ameliorates this type of defect, it does not absolve Redlich of the unfairness associated with an attorney abandoning his fiduciary and ethical responsibilities of full disclosure to his client. Malonis, 442 Mass. at 701-02. Moreover, consulting his divorce attorney would not reduce any of the inherent unfairness associated with P. Lanell having to choose between a less attractive fee agreement or establishing a new relationship with a different attorney. Salem Realty, 10 Mass.App.Ct. at 575. Even if P. Lanell’s divorce attorney advised him of the unfairness of Redlich’s actions, P. Lanell would still be constrained by the possibility that the change itself would have an adverse *705 effect on his position. As an experienced businessman who was accustomed to complex business negotiations, P. Lanell arguably would be more sensitive to the effect of changing attorneys with an offer on the table. Therefore, Redlich has not sustained his burden of proving that his influence over P. Lanell which arose out of a three-month relationship as well as Redlich’s success in securing a settlement offer of $1.454 million has been neutralized by divorce counsel or by some other means so that there was no overreaching of the client.
Given the foreseeability of P. Lanell’s change in financial circumstances, the doubtfulness of the validity of consideration, and lack of full disclosure by Redlich, this Court finds that the circumstances surrounding the creation of the CFA and subsequent modification markedly unfair to P. Lanell. Such a finding is consistent with the demands of the “highly fiduciary” nature of the attorney client relationship in Massachusetts and serves the public interest by protecting the client from the undue influence of the “expert” attorney. Opert 415 Mass. at 638.

b. Fairness of the CFA Itself

Perhaps an even stronger indication of the unfairness to P. Lanell is the terms of the CFA itself which attempted to subject the $1.454 million dollars admittedly owed by i2 to a contingency arrangement. A critical factor in judging the reasonableness of a contingent fee is the uncertainty of the attorney’s compensation. ABA Comm, on Ethics and Profl Responsibility, Formal Op. 94-389 (1994). On December 29, 2001, when the CFA was executed, i2 had previously indicated that its records confirmed that it owed P. Lanell $1.454 million. Therefore, the risk of non-recovery for that portion of the claim at the outset of the CFA was minimal. Redlich maintains that the Texas litigation filed by i2 in Federal District Court where i2 sought Declaratory Relief for the “proper construction and interpretation” of the contract between the company and P. Lanell, shows the uncertainty of the $1.454 million. This assertion, however, is undermined by affidavit admissions filed by i2’s counsel in both the Texas litigation and the Massachusetts litigation where i2 admits owing P. Lanell the $1.454 million. This judicial admission, in conjunction with i2’s pleadings in the Texas litigation that explicitly states that it “set out to pay P. Lanell the amounts owed to him” combine to discredit Redlich’s claim of uncertainly relative to the $1.454 million.
A reasonable assessment of these circumstances indicates that the Texas litigation minutely raised the risk of non-recovery on the $1.454 million, and created legitimate “uncertainly” only as to any amount due over and above the $1.454 million. Though i2 effectuated payment as soon as the Texas judge dismissed the case in July of 2002, i2 based the dollar figure on scorecard information well known to all parties as of December of 2001 and remained committed to fighting the remainder of P. Lanell’s claim. Moreover, during the period between January 2002 and July 2002, the so-called period of uncertainty, neither party challenged the validity of the $1.454 million and i2 never rescinded the offer. The evidence, therefore, contradicts Redlich’s claim that “uncertainty” justified a contingent fee rate structure.
The direct consequence of subjecting the $1.454 million to a contingency fee agreement is the establishment of a new fee of approximately $484,182.00 in contrast to a fee of $101,757.00 due under the September 4, 2001 hourly agreement.[12] As will be discussed later, an examination of the limited effort expended by Redlich to obtain payment of the $1.454 million offer in contrast to the value of the 1/3 CFA underscores the problem with the CFA. Redlich completed the work necessary to secure that portion of the claim by the end of December 2001 in which his firm expended approximately ninety-eight hours.[13] Based on actual hours spent, a $484,182.00 total fee translates to an hourly fee of $4,940.00 in sharp contrast to the agreed to hourly rate of $365.00. Even adjusting the agreed to hourly rate of $365.00 an hour to include the 5% bonus,[14] the $4,940.00 hourly rate results in a payment almost four times an already inflated bonus adjusted rate of $1,038.00.[15] Redlich cannot justify the inflated rate by comparison to either accepted market rates or by a significant period of uncertainty. Therefore, as a matter of law, the contingent fee relative to the $1.454 is “clearly excessive.” McInereny, 359 Mass. at 351 (where a court refused to enforce an attorney’s contingent fee contract which it found that it was “excessive and unreasonable as matter of law”).
Even more troubling than subjecting the offered $1.454 million to a contingent fee agreement in the first place is the artificial February 28, 2002 deadline stipulation. According to an e-mail dated December 27, 2001, Redlich inserted that date on the basis that,
[i]f they haven’t paid it by [February 28, 2002], I think it likely that the offer they have made will have fallen through. We are certainly in agreement that if i2 proceeds with what they have represented, i.e. that they are to pay you forthwith the $1.454 million without a settlement agreement or release, then my fee will be as stated in our earlier fee agreement letter. On the other hand, if i2 rescinds, or fails to follow through on that representation - and we need to fight with them about the initial $1.454 million, it would come under this new contingent fee agreement.
(Emphasis added.) Such a position is problematic from both a prospective and retrospective point of view. McI nereny, 359 Mass. at 353. From a prospective point of view, Redlich implicitly asserts either that any day after Februaiy 28, 2002 constitutes an unreasonable period of risk for non-recoveiy or that any amount of work done after that date would be sufficient to justify a large fee. Surely, Redlich cannot expect the court to enforce such an arbitrary and artificial time frame that in effect *706 irrationally distinguishes February 28, 2002 from March 1, 2002. Nor can Redlich maintain such an argument from a retrospective point of view. i2 never knew of the February 28, 2002 deadline. Redlich never demanded that i2 tender payment by that date or by any other. i2 never rescinded the offer. The evidence shows that i2 made the payment less than five months after the artificial deadline. Even though Redlich expended approximately 231 hours[16] between March 1, 2002 and July 19th when i2 wired the $1,454 million, the thrust of that work was to secure an amount of unpaid commissions in excess of the already agreed to $1,454 million. Therefore, Redlich cannot maintain that the contingent fee is justified by either “effort or a significant period of risk.”
In addition to violation of accepted principles of contingent fee arrangements, the artificial date of February 28, 2002 provides a disincentive to Redlich by creating a significant economic motive to let the February date lapse. Unlike the bonus agreement of the original agreement that motivated Redlich to resolve the issue in an expedited manner for the benefit of the client, the February 28, 2002 date provides significant incentive to withhold services from the client. The Massachusetts Rules of Professional Conduct specifically prohibit such disincentives because it “could induce an attorney to curtail services.” Mass.R-Prof.C. 1.5, cmt. [3].[17]Though Redlich attempts to justify the date in his December 27, 2001 e-mail to P. Lanell by stating, “(i]f they haven’t paid by then, I think it is likely that the offer they have made will have fallen through,” his words foreshadow what ultimately proves to be a passive approach to securing payment of the $1,454 million. According to the billing records, Redlich only contacted i2’s counsel once, on February 15, 2002, with regard to the $1.454, almost in passing, with the bulk of the communication focused on different procedural aspects of the Texas litigation and Massachusetts litigation. Furthermore, i2 counsel testified that he never knew about the agreement between Redlich and P. Lanell regarding the February 28, 2002 deadline date, and Redlich admitted that he never conveyed that information to i2. Redlich’s limited contact with i2 regarding the payment of the settlement and his failure to inform i2 of the significance of the deadline to P. Lanell indicate that the deadline of February 28,2002 indeed influenced Redlich to withhold services. Such lackluster representation falls well short of the duly of zealous advocacy and unflinching fidelity to the client’s interests, required of the profession, and adds yet another dimension of unfairness to an already shaky justification for the CFA in the first instance. More pointedly, Redlich’s failure to advise i2 of the February 28, 2002 deadline and his not demanding payment of the $1,454 million by that deadline with the threat of further litigation forces this Court to conclude that Redlich’s placement of the February 28, 2002 deadline in the CFA was not for the purpose of moving i2 towards timely payment of its offer, which would have been clearly in his client’s best interests, but rather to lock his client into the lucrative terms of the CFA, which strongly favored Redlich at his client’s expense.
As a final consideration as whether the fee agreement was “fair and reasonable,” this Court considers the provision of the CFA, requiring a non-refundable retainer fee. The provision provides in relevant part, that P. Lanell
shall pay an advance retainer of $20,000 to attorney. It is expressly agreed that attorney shall not be requested or required to reimburse or credit any portion of the retainer/attorney fees received by him during the course of his representation.
Though not specifically addressed in the Massachusetts Rules of Professional Responsibility, one Massachusetts court has noted that a non-refundable fee chills a client’s right to change attorneys by forcing a client to pay for services not rendered. Smith v. Binder, 20 Mass.App.Ct. 21, 23-24 (1985) (citing ABA Comm, on Ethics & Professional Responsibility, Informal Op. 998 (1967), and stating that it is unethical to require agreement that retainer be nonrefundable). The ABA Code of Professional Responsibility provisions strongly suggest that a non-refundable retainer fee would conflict with several of its disciplinary rules. ABA Code of Profl Responsibility DR Op. 95-2. First it violates DR 2-106(a) which states that “[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee,” because if a client discharged his attorney shortly after the attorney had been engaged and prior to the attorney taking any substantial action on the subject of the representation, the fee might clearly be excessive. Id. In addition DR 2-110(B)(4) provides that “[a] lawyer . . . shall withdraw from employment, if ... he is discharged by his client and DR 2-110(A)(3) provides that ”[a] lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned." Id. Based on these rules, the ABA expressed the opinion that it would be unethical for an attorney to charge a non-refundable retainer fee for a particular service orease. For public policy reasons, then, this Court voids the non-refundable fee provision and notes that the inclusion of such a fee contributes to the already pervasive sense of unfairness toward the client.[18]
2. Fairness of the Modification to the CFA, dated January 22, 2002
The modification to the CFA, dated January 22, 2002, raises similar concerns of fairness and a troubling pattern of Redlich’s disregard of his fiduciary duties to P. Lanell. Redlich asserts that the modification was required because the first contingent fee arrangement of December 27, 2001 “was premised on the understanding that we would be filing a Complaint on your behalf against i2 in the Massachusetts State or Federal Court,” and did not anticipate i2’s filing in Texas. Despite this claim the plain language of the December 27, 2001 CFA states that the parties agree that Redlich’s services with respect to
[t]he claim, controversy, and other matters with reference to which the services are to be performed are: The recovery of amounts owed to you e.g., for *707 wages, bonus commissions, severance, benefits and penalties, by i2 Technologies, Inc.
Considering that i2 is a multi million-dollar company headquartered in Texas and Redlich communicated with i2’s corporate counsel in Texas as early as September 2001, Redlich should have anticipated a possible complaint in Texas. Moreover, Redlich, as the drafter of the CFA, could have geographically limited his services to Massachusetts but he did not. See Raymond Leasing v. Callico Distrib., 62 Mass.App.Ct. 747, 749 n.3 (2005) (ambiguity construed against the drafter). Though the language of the contract is broad relative to the scope of the representation, it is nonetheless unambiguous and should be enforced according to its terms.
In addition to violating well-established contract principles, Redlich’s attempt to modify the September 10, 2001 fee agreement yet another time further injures his “highly fiduciary” relationship with P. Lanell. Allowing Redlich to charge separate fees for the ‘Texas litigation” and the “Massachusetts litigation” would result in Redlich receiving a double payment for a single claim or controversy. Because each litigation arises out of the same set of facts, they necessarily overlap. The most clear evidence of the interplay between the two is that as soon as the Texas litigation was dismissed, the $1.454 million part of the Massachusetts claim settled. In distinguishing the “Texas litigation” from the “Massachusetts litigation,” Redlich expects the court to parse the developments in each to determine the precise impact on his fee. As both litigations arise out of the same controversy, such an exercise would be futile. Enforcing such an agreement would allow an attorney to collect a “clearly excessive fee” in violation of Mass.R.Prof.C. 1.5 by charging twice for the same work. Moreover, such an agreement is void for public policy because enforcement would erode the lawyer’s “unflinching duty” to serve the client’s interests. Pollock, 543 Mass. at 555.
3. The Impact of the Unfairness
Despite Redlich’s inability to demonstrate the fairness of the CFA and its modification themselves and of the attending circumstances, the whole CFA is not void ab initio. Town Planning & Engineering Associates, Inc. v. Amesbury Specialty Co., 369 Mass. 737, 745-46 (1976) (describing severability of contract provisions that are void for public policy). In determining whether to enforce a contract that violates public policy, the court developed a “vector of considerations.” Id The relevant factors include, (1) the nature of the subject matter of the contract; 2) the extent of the illegal behavior; 3) the materiality of the behavior to the performance of the contract; 4) the strength of the public policy underlying the prohibition; 5) the effect on public policy if the no sanction were applied; and 6) the seriousness of forfeiture suffered by the plaintiff. Id In Town Planning, the court observed that in cases involving more serious violations of public policy, the proper judicial response would be to limit recovery to Quantum Meruit. Id at 747.
These factors have been applied in the context of the contingent fee agreements where attorneys have violated the rules of ethics that govern them. Daynord v. Ness, 188 F.Sup.2d 115, 127-29 (2002). Typically the court allows recovery of a reasonable fee as long as there was no conflict of interest or other factor rendering the representation itself illegal. Guenard v. Burke, 387 Mass. 802, 807-08 (1982). For example, the rules of professional conduct explicitly prohibit contingent fees in a “domestic relations matter,” but the Guenard court allowed the defendant attorney to collect a reasonable fee despite the prohibition because his representation of the client involved a property settlement after a decree nisi had been entered. Id at 806. Because the decree nisi had already entered, the contingent fee arrangement in Guenard did not violate the public policy surrounding the prohibition which is designed to encourage reconciliation by removing the incentive to the attorney to press forward with a divorce. Id In applying the principles announced in Town Planning and allowing recovery to the extent the fee reflected the fair market value of the services, the court stated that, “[r]epresentation of the client was not illegal; only the contingent fee agreement was. The loss to the defendant of the reasonable fee and the windfall to the plaintiff in being relieved of the obligation to pay any attorneys fee for the defendant’s proper services would be unreasonable in the circumstances." Id at 808 (citing Town Planning Services, 369 Mass. at 746). See Young v. Southgate Development Corp., 379 Mass. 523, 524-26 (1980) (while refusing to enforce a contingent fee agreement that the client never signed, while citing the explicit prohibition against an unsigned contingent fee agreement, the court nonetheless determined that the attorney deserved the fair market value of his services). Compare with Bloomenthal v. Halstrom, No. 951773B, 1999 WL 1318980 (Mass.Super. Mar. 16, 1999) (Bumes, J.) (10 Mass. L. Rptr. 8) (rejecting recovery on the contract and in quantum meruit because conflict of interest in previous representation of adverse party rendered representation illegal). Thus, the nature of the violation and its degree of seriousness are relevant. Guenard, 387 Mass. at 807.
Applying of the “vector of considerations” in this case, this Court concludes that Redlich is entitled to collect his fee on a theory of quantum meruit. The nature of the subject matter of the agreement that is at issue here, is whether the conversion of an hourly fee into a contingent fee agreement is unreasonable. Altering the agreement at such a pivotal juncture of the negotiations undermines the “highly fiduciary” nature of the attorney client relationship and erodes public confidence in the legal profession by creating the appearance that the attorney client relationship exists to serve the interests of the attorney. Changing the fee agreement undermines the twin functions of the original agreement which established the existence of an attorney client relationship and the fundamental understanding of the basis of the fee as required by Mass.R-Prof.C. 1.5(b). Enforcing the changes as advanced by Redlich in the CFA sends the unwelcome *708 message that an attorney is free to make changes to a fee agreement as foreseeable risks adverse to the attorney begin to materialize. Such a message would chill the client’s unfettered right to terminate an attorney no longer trusted. Though the public policy considerations are considerable, the forfeiture by Redlich of compensation for services rendered is too great and would result in a substantial windfall to P. Lanell. Therefore, principles outlined in Town Planning compel the conclusion that Redlich should be compensated on a theoiy of quantum meruit.
The fair and reasonable value of services, however, is not limited necessarily to an assessment of time spent by an attorney. Mulhern v. Roach, 398 Mass. 18, 27 (1986). In Mulhem, an attorney successfully argued that despite the absence of a written contingent fee agreement, the fair and reasonable fee amounted to one third of the settlement. Id. at 26. In upholding the large fee as determined by the trial judge, the Supreme Judicial court recognized the principles of Rule 1.5 that: 1) the attorney was a highly regarded expert in the field of eminent domain; 2) that the underlying issue was “highly unusual”; 3) that the attorney spent a great deal of time; 4) that the price was similar to others firms” in the area for “like services”; and that the result of the attorney’s efforts was “almost miraculous.” Id. at 24-30.
The circumstances of this case are not similar to those in Mulhem. Unlike the lawyer in Mulhem, Redlich kept meticulous time records. Though actual time worked is not the “lodestar” of a fair and reasonable fee, actual time kept is a useful tool in a determination of a reasonable fee. See Mulhern, 398 Mass. 26 n. 11 (citing Salem Realtg Co., 10 Mass.App.Ct. at 677 n.5, and emphasizing utility of keeping time records even when time is not expected to be the basis of the billing). The underlying claim in the instant case involved a relatively straightforward negotiation of a disputed wage claim with a relatively co-operative defendant. Until the end of December 2001 Redlich’s work consisted of making several telephone calls between interested parties, drafting a complaint against i2 to be filed in Massachusetts Federal District Court, and organizing a list of disputed commissions as presented to him by P. Lanell. Though the claim itself involved a relatively novel application of the Wage Statute, which potentially exposed i2 to treble damages,[19] Redlich’s work relative to that aspect of the case consisted of preparing the complaint, filing a memorandum in opposition to i2’s motion to dismiss the Wage Statute claim and, several days after having been discharged by P. Lanell, sending a Superior Court opinion broadening the application of the Wage Statute to the attention of the federal judge in August 2002. By the time the federal judge commented, at the November 2002 hearing on i2’s motion to dismiss, that the Superior Court opinion “appears persuasive to me,” Redlich had already been fired and did not appear on behalf of P. Lanell at the motion. While sending the Superior Court opinion to the federal judge after he had been terminated represents compliance with Mass.R.Prof.C. 1.16(d) requiring a discharged attorney to take “reasonably, practicable” steps to protect a client’s interests, providing relevant case law to the court is a routine task of eveiy lawyer. Therefore even though the application of the Wage Act was novel, the skills “requisite to perform the legal service properly” were not so complex or difficult that a premium for Redlich’s services is implied. Mass.R-Prof.C. 1.5(a). In contrast, the lawyer in Mulhem spent a great deal of time analyzing the facts and voluminous documents in preparing for trial while Redlich simply accepted P. Lanell’s word as to the integrity of the commissions without the tedious work of pouring through the paperwork. Id., 398 Mass, at 26. In sharp contrast, his successor attorney, Emstoff, demanded i2’s accounting records and received some 10,000 pages worth. Emstoff wisely retained a forensic accountant to assist him in reviewing them in detail.
Though it is clear to this Court that the ultimate amount of the settlement was influenced by a favorable ruling on the Motion to Dismiss from the federal judge concerning the application of Wage Statute, a theoiy first raised by Redlich, the fype of legal work required did not involve any special expertise or skills. Of note, is the fact that the ruling was at the dismissal stage of the litigation. The rule governing motions to dismiss for failure to state a claim raises a low bar. The court must view the claims in the complaint with an indulgent eye in favor of the plaintiff. It is for this reason, no doubt, that the federal district court judge invited the parties to move for summaiy judgment on the issue so that he could decide the matter after the case had been more substantially developed. The court is not persuaded that the novelty of the issue presented by the wage claim, the expertise of Redlich in resolving the claim, the time spent, or any other factor justifies a departure from a fee other than payment for actual hours expended.[20] Mulhern, 398 Mass. at 25-28.
Based on the prevalent unfairness surrounding the circumstances of the fee agreement modifications, resulting in the CFA, this court will not enforce the CFA but shall order compensation for Redlich for the reasonable value of his services. Redlich’s invoices show that he charged P. Lanell the following for services rendered:
1) $29,257.00 for services between September 1, 2001 and December 31, 2001; 2) $72,700.00 for the five percent bonus; 3) $81,848.00 for actual billings in the Texas litigation; 4) $44,898.00 based on actual hours worked in the Massachusetts litigation; and 5) $365.00 for one hour for Redlich’s services in providing the Superior Court opinion to the federal court in August of 2002.
The total due for services then is $229,068.00. P. Lanell has paid: 1) $1,250.00 in September of 2001; 2) $5,000.00 in October 2001; and 3) $116,243.71 in July of2002. Taking into account these invoices and credits, as measured by actual hours worked and fees incurred, Redlich is entitled, under a quantum meruit theoiy, to a fee of $106,574.29 from P. Lanell for services rendered.
*709 As will be discussed later, Redlich also claims that under the CFA he is entitled to 1 /3 of the January 14, 2004 $2,599,990.00 Settlement Agreement that Ernstoff obtained. Since this Court has found that the CFA is unenforceable and since P. Lanell terminated the attorney-client relationship in July 2002, some two years before the January 14, 2004 Settlement Agreement, Redlich, at best, would be entitled to attorneys fees under quantum meruit if he substantially contributed to the January 14, 2004 Settlement Agreement. As indicated in the Findings of Facts, this Court finds that Redlich’s efforts both before and after his termination as P. Lanell’s attorney did not substantially contribute to the January 14, 2004 Settlement Agreement. Rather, Ernstoff obtained that $2,599,990.00 Settlement Agreement by dent of his own aggressive advocacy on P. Lanell’s behalf.

4.Redlich’s Count II (Fraud, Misrepresentation, and Civil Conspiracy/Aiding and Abetting) in CM Action No. 2002-03213-C

To prevail on a claim for fraud, Redlich must establish by a preponderance of the evidence that he reasonably relied to their detriment on a false statement of material fact made by the defendant to induce Redlich to act. Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982). A claim for fraud must be based on statements of fact as opposed to statements of opinion, estimate, expectation, belief or judgment. Powell v. Rasmussen, 355 Mass. 117, 118 (1969). However, a statement in the form of an opinion, belief or judgment may be actionable as a statement of material fact “if the representation is false and the subject matter is one susceptible of actual knowledge.” Briggs v. Carol Cars, Inc., 407 Mass. 391, 396 (1990). This circumstance is particularly true where the maker of the statement is in a position for which he or she may have special knowledge of facts. Id. Failure to disclose a material fact constitutes fraud where there exists a duty to disclose such facts. Ravosa v. Zais, 40 Mass.App.Ct. 47, 51 (1996); Greenery Rehab. Group v. Antaramian, 36 Mass.App.Ct. 73, 78 (1994).
Redlich asserts that P. Lanell committed bad faith and fraud in failing to disclose that when he executed the CFA he did not plan to pay Redlich one-third of the $1.454M and in inducing Redlich to continue to fight with i2 for the $1.454M. The facts found by this Court simply do not support this contention. Rather the evidence and this Court’s findings show that at the time he signed the CFA, he had some concerns about the application of the 1/3 contingency fee on the $1,454 million and that some time afterwards his concerns heightened as he began to understand how the operation of the CFA would impact on the marital estate. Eventually, he began to dispute the fee. There is no fraud. Rather there is a dispute over the amount and measure of the CFA that Redlich demanded. This analysis applies equally to Redlich’s claim of misrepresentation. Finally, this Court specifically found that P. Lanell and K. Lanell did not engage in any conspiracy of any sort to deprive Redlich of his attorneys fees. Judgment shall enter for the Lanells on these counts.
5. P. Lanell’s Counterclaims for Unfair and Deceptive Acts or Practices in Violation of G.L.c. 93A, Sec. 2 and 9 (Count III in Civil Action No. 2002-03213-C and Count III in Civil Action No. 2004-1303-F)
Massachusetts General Laws chapter 93A, makes unlawful any “(u)nfair... acts or practices in the conduct of trade or commerce.” Under c. 93A the plaintiff must establish: (1) standing as a person subject to the act; (2) an unfair or deceptive practice within a business context; (3) a 30-day demand letter was sent, however the demand requirements shall not apply if the claim is asserted by way of counterclaim or cross claim; and (4) damages caused by the unfair or deceptive act. G.L.c. 93A, §9.
The essence of P. Lanell’s claim is that the CFA was void ab initio and that Redlich’s attempt to enforce the legally void CFA constituted an unfair and deceptive practice. Although this Court has found that CFA was not void ab initio, I have found that the CFA is unenforceable because of the problem with the artificial February 28, 2002 deadline. Redlich’s failure to zealously represent his client to obtain the offered $1,454 million because of the disincentive created by the February 28, 2002 deadline violated the rules of professional responsibility and voids the CFA. Redlich’s attempts to enforce the CFA violates G.L.c. 93A. Guenard v. Burke, 387 Mass. 802, 443 N.E.2d 892 (1982), makes clear that a fee agreement that violates the rules of professional conduct and upon which counsel relies to collect his fee is a violation of G.L.c. 93A as a matter of law. Id. at 809. (“We conclude that because the purported contingent fee agreement was unenforceable, his reliance on that agreement to justify the amount of his fee was improper. The defendant’s reliance on an agreement made in violation of S.J.C. Rule 3:14 in these circumstances was, as a matter of law, an unfair or deceptive act or practice.”) Under G.L.c. 93A, §9, P. Lanell is entitled to $25.00 or his actual damages, doubled or trebled if Redlich’s conduct is found by this Court to be willful or knowing. This Court finds that P. Lanell has failed to demonstrate any actual damages. Further, this Court does not find Redlich’s violation of G.L.c. 93A, §9 to be willful or knowing. Consequently, this Court shall award him $25.00 in damages plus his reasonable attorneys fees.

6. Intentional Interference with Contract

Redlich claims that P. Lanell’s estranged wife, Kathleen Lanell, knowingly induced P. Lanell to break the contract with Redlich with an improper motive of depriving Redlich of the benefit of his bargain. To make out a case of intentional interference with a contract, a plaintiff must prove that, “(1) he had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Melo-tone Vend *710 ing, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 318 (1995) (citations omitted). Because Redlich’s evidence, at best, supports only the first element of the test (which this Court does not find) and none of the others, his claim must fail.
The Court uses the phrase “at best” because arguably the CFA was unenforceable at the time that Redlich claims that K. Lanell interfered with P. Lanell’s performance of it. In fact the evidence shows that in March 2002 Redlich was put on notice by K. Lanell, or more accurately, her attorney, Legasey, that there would be a problem with the CFA because of its impact on the marital estate. Atly. Legasey first raised an objection, on behalf of his client, K. Lanell, to the operation of the 1/3 CFA fee on the $1.454 million at a meeting with Redlich in March 2002.[21] Later in March, Atty. Legasey more pointedly objected to the operation of the CFA in his March 29, 2002 letter to Redlich in which he stated:
While I expect you to receive an hourly fee for pursuing the $1,500,000.00 which is on the table, a contingent fee of $500,000.00 for the pursuit of money that is going to be paid sooner or later without any question is, in our view, unconscionable.
At this point, it is clear that K. Lanell, through her attorney had taken the position that the CFA was an unenforceable agreement and had sharply communicated this view to Redlich.
Since this Court has found that the CFA as amended is unenforceable as a matter of law, there is no contract with which Kathleen Lanell could interfere.
In addition, as a party to the divorce proceedings, K. Lanell’s goal was to maximize the marital estate. Rather than “interfering” as Redlich suggests, K. Lanell’s resistance to the unenforceable contract was a natural response to an unfair and unenforceable agreement. Moreover, the evidence reflects her intent to honor the September 10, 2001 contract between Redlich and her estranged husband. In the divorce agreement itself, K. Lanell agreed that:
[s]hould Husband’s attorney (Mark Redlich, Esq.), demand additional counsel fees in connection with this i2 payment, the parties shall attempt to reach an agreement with him regarding said fees. In the event there is no mutual agreement regarding payment of fees, the parties shall engage in binding arbitration with him under the Massachusetts Bar Association Fee Disputes Procedure. If said attorney refuses to enter into the Massachusetts Bar Association Disputes Procedure, the parties shall engage in process as is necessary to have a third party, including a court resolve the fee dispute. Both parties shall act in good faith to minimize the attorneys fees claimed by the attorney in excess of those amounts set forth in the original Fee Agreement dated September 10, 2001, and the stipulation of December 28, 2001.
(Divorce Agreement, p. 4) (Emphasis added.) This provision merely acknowledges disagreement about the enforceability of the contingent fee agreement and agrees to resolve it under the Massachusetts Bar Association Disputes Procedure, the prescribed method of resolving fee disputes between attorney and client. Mass.R-Prof.C. 1.5 cmt. 5. In addition, she agreed that the money should be held in escrow until a determination could be made on the validity of the contingent agreement. Given the unenforceability of the December 27, 2001 and January 22, 2002 agreements, the interference with contract fails to satisfy the first element of such a claim establishing the existence of a contract. Melo-tone Vending, Inc., 39 Mass.App.Ct. at 318. As Redlich cannot show an enforceable contract, his claim of intentional interference with contract fails.
7. Kathleen Lanell’s Counterclaim Alleging Abuse of Process
Kathleen Lanell counters that by filing the Verified Complaint for Declaratory and Injunctive Relief against her, Redlich abused process. The Restatement (Second) ofTorts §682 describes abuse of process as “one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused the abuse of the process.” (Emphasis added.) Such a claim comprises the following elements: “(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.” Adams v. Whitman, 62 Mass.App.Ct. 850, 853 (2005). This tort usually involves a form of coercion to obtain collateral advantage not properly involved in the proceeding itself similar to extortion. Id. (citing Powers v. Leno, 24 Mass.App.Ct. 381, 383-84 (1987)). Though it is sometimes said that “(t]he subsequent misuse of the process, although properly obtained, constitutes the misconduct for which liability is imposed,” Massachusetts courts have found that initiating process alone can be so coercive and promoting of ulterior advantage that it supports an abuse of process claim. Kelley v. Stop & Shop Cos., 26 Mass.App.Ct. 557, 558 (1988), quoting from Restatement (Second) ofTorts §682. See Adams, 850 Mass. at 856 n.9. The real question is whether the “object of the action . . . was not that for which the action purported to have been brought... but was for the purpose of [something else].” See Malone v. Belcher, 216 Mass. 209, 211 (1913). An abuse of process claim can be made out in a situation where the original process was validly obtained on probable cause. Adams, 850 Mass. at 856 n.9.
The circumstances of Redlich filing a claim against K. Lanell indicate that the primary reason Redlich filed the claim was to coerce P. Lanell into his abandoning the dispute over the fee due Redlich under the CFA. The strongest evidence of Redlich’s ulterior motive lies in the timing of his filing of the suit against K. Lanell. The sequence of events are as follows. On or about Friday, July 19,2002, without requiring a release and pursuant to the express terms of the December 28, 2001 Stipulation, i2 paid, via wire transfer, the sum of $116,243.71 directly to Redlich. Within hours after confirming that *711 his fee had been received by his Bank, Redlich sent an e-mail to P. Lanell’s divorce attorney, Boileau, with a copy to P. Lanell threatening to seek court intervention if the balance of his one-third contingency fee in the sum of $396,101.49 was not paid by Monday, July 22, 2002. On the morning of July 23, 2002, at 10:14 A.M., P. Lanell, who had not yet received his portion of the i2 monies, sent an e-mail to Redlich in which he admonished Redlich for his “insensitive and somewhat confrontational” e-mail challenging his divorce attorney and him to “pay immediately or face litigious action.” P. Lanell further challenged the reasonableness of Redlich’s fee agreements. He also advised Redlich that the threatened litigation “could potentially compromise [his] ability to settle [his] divorce or prevail in [his] claim against i2.” P. Lanell then requested that Redlich contact him to discuss “some other arrangement for settlement of legal fees . . .” At 12:37 P.M. also on July 23, 2002, Redlich forwarded to P. Lanell, Boileau and Legasey, a copy of a Complaint for Declaratoiy Judgment and Injunctive Relief that he had filed against P. Lanell’s then estranged wife, K. Lanell, to recover fees in accordance with the December 27, 2001 CFA, notwithstanding that K. Lanell was not a party to and did not sign the CFA. Redlich admitted that he read Lanell’s earlier e-mail prior to filing the Complaint for Declaratory Relief.
In short, not only did Redlich file the Complaint for Declaratory Relief against K. Lanell amid ongoing contentious settlement negotiations between the Lanells, but he filed the complaint early Tuesday afternoon, less than three hours after Redlich received an e-mail from P. Lanell disputing the reasonableness of his fee. By filing so quickly, Redlich ignored the command of Mass.R.Prof.C. 1.5 to “conscientiously consider mediation or an established fee arbitration service” to resolve fee disputes with one’s client. See Mass.R.Prof.C. 1.5 cmt. 5. His impulsive reaction and willful ignorance of the Rules of Professional Conduct leave this court with the undeniable impression that Redlich filed the complaint against K. Lanell primarily for the purpose of coercing P. Lanell into acquiescing into his demands to honor an unenforceable contract by deliberately disrupting the ongoing divorce settlement. By using the legal process in this way, Redlich gained an unlawful “collateral advantage” in the fee dispute. Powers, 24 Mass.App.Ct. at 383-84. (“While bad intentions alone are not enough to impose liability, ‘the case is otherwise where there is a “form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property . . .” ’ ”) (citations omitted). Redlich’s improper use of the legal process resulted in damage to Kathleen Lanell in the form of attorneys fees required to defend herself against the claim. K. Lanell offered evidence that her attorneys fees amounted to $18,025.00. Accordingly, this Court shall order that judgment enter in favor of K. Lanell on her abuse of process claim against Redlich for $18,025.00.
B. Marc Redlich v. Peter Lanell & Steven E. Ernstoff SUCV2004-01303-C 1. Redlich’s claims for attorney fees from Ernstoff and P. Lanell
In this action, Redlich seeks to enforce his CFA against the $2,599,990.00 January 14, 2004 Settlement Agreement that Ernstoff obtained for P. Lanell from i2. This Court’s rulings of law and findings of fact apply with equal force to this action.
As stated previously, Massachusetts law provides that a client is free to discharge his attorney at any time, whether or not there is a contingent fee agreement. Salem Realty Co. v. Matera, 384 Mass. at 804. The discharge obviates any contract claim the lawyer might otherwise have to a contingent fee under his agreement with the client. Id., Opert v. Mellios, 415 Mass. at 636; Craft v. Kane, 51 Mass.App.Ct. at 653. As indicated above, a discharged lawyer may, under certain circumstances, recover in quantum meruit, for the value of the services rendered. However, the discharged attorney may recover attorneys fees only from his former client and not from successor counsel. Malonis v. Browning-Ferris Industries, Inc., 2001 Mass.App.Div. 149 (2001). Consequently, this Court finds that Ernstoff is not responsible for payment of any of Redlich’s fees. Second, discharged counsel must show, among other factors, that his efforts prior to discharge substantially contributed to successor counsel’s final successful results. Redlich’s efforts did not substantially contribute to the final January 14, 2004 Settlement Agreement obtained by Ernstoff.
This was a complex case but the complexity of the case was not in its initial stages. The more difficult and demanding areas involved the pretrial litigation conducted by Ernstoff including but not limited to production and analysis of over 10,000 documents, the taking of many depositions in Boston, Dallas and Newark, filing and defending numerous substantive motions, and negotiating and convincing i2 to pay $2,599,990 after it had already paid Lanell $1.454 million, and then accrued their exposure at $0.
The amount involved in the Lanell matter is clearly substantial. Lanell retained Redlich to recover all of the monies owed him by i2. i2 eventually paid Lanell a total of $4,054,732.50. Redlich claims that it was his efforts rather than Ernstoffs which resulted in i2’s eventual payment of the entire amount. This Court finds that the services rendered by Redlich in both the Texas and Boston litigation, all of which were performed prior to his termination, were preliminary in nature and largely routine.
Insofar as Redlich claims that the same efforts in Texas and Boston also resulted in i2’s payment of an additional $2,599,990.00, this Court is not convinced. As stated previously, Redlich has already been paid for most of those efforts. His only partially uncompensated time was once again, for work that was preliminary in nature and largely routine. Redlich claims that the *712 memorandum he submitted in opposition to the Defendant’s Motion to Dismiss Count III of the Plaintiffs Complaint (violation of the Massachusetts Wage Statute) was instrumental in Judge Wolfs determination at the hearing held on November 13, 2002. However, this Court notes that no definitive ruling was issued at that hearing as to applicability of the Massachusetts Wage Statute at this stage of the litigation. Rather, this Court finds that Judge Wolf applied the indulgent standard applicable to motions to dismiss based on the theory of the complaint failing to state a claim upon which relief can be granted, and rightly chose not to dismiss the matter at such an early stage in the litigation. Harvey testified that Judge Wolfs decision had no impact on his opinion as to the value of the case, and this is evidenced by the fact that i2’s $500,000.00 accrual at the end of December 2002, clearly did not reflect a likelihood that treble damages would be imposed.
This Court finds that Judge Wolfs remarks were tentative in nature, and did not constitute a conclusive determination that the P. Lanell case would be governed by the Massachusetts Wage Statute. This Court further finds that the agreement by i2 to pay an additional $2,599,990.00 to P. Lanell was secured by the skillful handling of the pretrial phase and negotiations by Emstoff and his associates, and not by the efforts of Redlich.
Moreover, this Court finds that Emstoff is not responsible for payment of any of Redlich’s fees. Ernstoff never contracted with, made representations to or promised Redlich or P. Lanell that he would be responsible for compensating Redlich for his time in the Boston litigation.
This Court therefore finds that Redlich is not entitled to any compensation from the $866,663.33 being held by Emstoff in escrow pursuant to this Court’s preliminary injunction issued April 12, 2004, as modified on May 4, 2004 and confirmed on July 8, 2004.
Further, this Court finds that Emstoff is entitled to the entire attorneys fees of $866,663.33 pursuant to his contingent fee agreement with P. Lanell as generated from the $2,599,990 settlement between P. Lanell and i2, and this Court hereby forthwith dissolves the injunction previously issued by this Court as set forth above.

2. Redlich’s Count II (Bad Faith Breach of Contract), Count III (Breach of Implied Covenant of Good Faith and Fair Dealing); Count VI (Fraud) (misnumbered Count IV)

That the bad faith termination of an attorney is subject to sanction resonates deeply with general principles of contract law. It is a cardinal rule of Massachusetts contract law that every contract carries with it the implied obligation of good faith and fair dealing. This rule is set forth in the Massachusetts Supreme Judicial Court’s seminal decision of Fortune v. National Cash Register Co., 373 Mass. 96, 102 (1977), and was alluded to by the SJC in its Salem decision, 384 Mass. at 804. “Good faith and fair dealing between parties are pervasive requirements in our law; it can be said fairly, that parties to contracts or commercial transactions are bound by this standard.” Fortune, 373 Mass. at 102. The Supreme Judicial Court has concluded that this covenant imposes an obligation on each party not to do anything “which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .” Id., 373 Mass. at 104 (Emphasis added; internal quotation marks and citations omitted.). Cf. Kansas City College of Osteopathic Medicine v. Employers’ Surplus Lines Insurance Co., 581 F.2d 299, 303 (1st Cir. 1978) (Court relies on the “recognized contract law principle of an implied contractual duty to cooperate and facilitate the performance of mutual promises”).
In the previous sections, this Court has already ruled that P. Lanell could lawfully terminate the attorney-client relationship he had with Redlich. Further, this Court specifically found that the termination was not made in bad faith. Because P. Lanell terminated the attorney-client relationship with Redlich because of Redlich’s unprofessional conduct in suing K. Lanell against his client’s wishes and legal interests and in order to force K. Lanell to release the attorneys fees to which he believed he was entitled, P. Lanell’s termination of the attorney-client relationship did not constitute breach of implied covenant of good faith and fair dealing. If anyone took action to destroy the benefit of the contract, it was Redlich. Finally, as pointed out above, there is no merit to Redlich’s fraud and misrepresentation claims. Judgment shall enter in favor of P. Lanell on each of these counts.
V ORDER

A. Marc Redlich v. Kathleen Lanell and Peter Lanell SUCV2002-03213-C:

1) Judgment for damages shall enter in favor of plaintiff Marc Redlich and against defendant Peter Lanell, on Count I of his Complaint in Civil Action No. 2002-03213-C, pursuant to quantum meruit in the amount of $106,574.29, with costs.
2) Judgment shall enter in favor of defendant Kathleen Lanell on Count I of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs. In addition, this Court explicitly finds that defendant Kathleen Lanell is not liable to pay plaintiff Marc Redlich any legal fees in connection with plaintiff Redlich’s representation of defendant Peter Lanell.
3) Judgment shall enter in favor of the defendant Peter Lanell, on Count II (Fraud) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs.
4) Judgment shall enter in favor of the Defendant, Peter Lanell, on Count III (Misrepresentation) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs.
5) Judgment shall enter in favor of the Defendant, Peter Lanell, on Count IV (Civil Conspiracy/Aiding and Abetting) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs.
*713 6) Judgment shall enter In favor of the Defendant, Kathleen Lanell, on Count IV (Civil Conspiracy/Aiding and Abetting) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs.
7) Judgment shall enter in favor of the Defendant, Kathleen Lanell, on CountV (Interference With Advantageous Business and Contractual Relations) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2002-03213-C with costs.
8) Judgment shall enter in favor of plaintiff Marc Redlich, on Count I (Misrepresentation) of defendant Peter Lanell’s Counterclaim in Civil Action No. 2002-03213-C with costs.
9) Judgment shall enter in favor of plaintiff Marc Redlich, on Count II (Fraud) of defendant Peter LaneU’s Counterclaim in Civil Action No. 2002-03213-C with costs.
10) Judgment shall enter in favor of defendant Peter Lanell on Count III (Unfair and Deceptive Acts or Practices in Violation of G.L.c. 93A, Sec. 2 and 9) of his Counterclaim in Civil Action No. 2002-03213-C. The Court awards defendant P. Lanell $25.00 in damages plus his reasonable attorneys fees and costs. Defendant P. Lanell shall file his motion and supporting affidavit for reasonable attorneys fees and costs within 60 days of the date of this Order.
11) Judgment shall enter in favor of the Defendant, Peter Lanell, on Count IV (Breach of Fiduciary Duty) of his Counterclaim in Civil Action No. 2002-03213-C with costs. Defendant Lanell is awarded costs and attorneys fees in an amount to be determined by this Court after an additional hearing. Defendant P. Lanell shall file his motion and supporting affidavit for reasonable attorneys fees and costs within 60 days of the date of this Order.
12) Judgment shaU enter in favor of the Defendant, Peter LaneU, on CountV (Declaratory Judgment) of his Counterclaim in CivU Action No. 2002-03213-C, and Plaintiffs Uen filed pursuant to M.G.L.c. 221, Sec. 50 is hereby discharged. In addition, this Court expficitly finds that Peter LaneU is not fiable to pay Plaintiff Marc Redlich any legal fees over and above the amount of $106,574.29 previously awarded to him. Defendant is awarded his costs.

B. Marc Redlich v. Peter LaneU and Steven E. Ernstoff SUCV2004-01303-F

1) Judgment shall enter in favor of the Defendant, Peter Lanell, on Count I (Declaratory Judgment and Contract) of Plaintiffs Marc Redlich’s, Complaint in Civil Action No. 2004-1303-F. In addition, this Court explicitly finds that defendant Peter Lanell is not liable to pay plaintiff Marc Redlich any legal fees resulting from the i2 payment made in January 2004. Defendant is awarded his costs.
2) Judgment shall enter in favor of Defendant, Steven EL Ernstoff on Count I (Declaratory Judgment and Contract) of plaintiff Marc Redlich’s, Complaint in Civil Action No. 2004-1303-F. In addition, this Court explicitly finds that Steven E. Ernstoff is not liable to pay Marc Redlich any legal fees in connection with Attorney Redlich’s representation of Peter LaneU. Further, the injunction issued by this Court on April 12, 2004, as modified on May 4, 2004 and confirmed on July 8, 2004 is hereby dissolved. Judgment for costs for the Defendant, Steven E. Ernstoff.
3) Judgment shall enter in favor of defendant Peter LaneU, on Count II (Bad Faith Breach of Contract) of plaintiff Marc Redlich’s, Complaint in Civil Action No. 2004-1303-F. In addition, this Court expficitly finds that Peter Lanell is not liable to pay Plaintiff Marc Redlich any legal fees resulting from the i2 payment made in Januaiy 2004. Defendant is awarded his costs.
4) Judgment shall enter in favor of defendant Peter LaneU, on Count III (Breach of Implied Covenant of Good Faith and Fair Dealing) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2004-1303-F. In addition, this Court explicitly finds that Peter Lanell is not liable to pay Plaintiff Marc Redlich any legal fees resulting from the i2 payment made in January 2004. Defendant is awarded his costs.
5) Judgment shall enter in favor of Peter LaneU, on Count IV (Quantum Meruit) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2004-1303-F. In addition, this Court explicitly finds that Peter Lanell is not liable to pay Plaintiff Marc Redlich any legal fees resulting from the i2 payment made in January 2004. Defendant is awarded his costs.
6) Judgment shall enter in favor of the Defendant, Peter LaneU, on Count VI (Fraud) (mis-numbered Count IV) of plaintiff Marc Redlich’s Complaint in Civil Action No. 2004-1303-F. In addition, this Court explicitly finds that Peter Lanell is not liable to pay Plaintiff Marc Redlich any legal fees resulting from the i2 payment made in January 2004. Defendant is awarded his costs.
7) Judgment shall enter in favor of plaintiff Marc Redlich on Count I (Misrepresentation) of defendant Peter LaneU’s Counterclaim in CivU Action No. 2004-1303-F.
8) Judgment shall enter in favor of plaintiff Marc Redlich, on Count II (Fraud) of defendant Peter LaneU’s Counterclaim in Civil Action No. 2004-1303-F.
9) Judgment shall enter in favor of defendant Peter LaneU on Count III (Unfair and Deceptive Acts or Practices in Violation of G.L.c. 93A, Sec. 2 and 9) of his Counterclaim in Qvil Action No. 2004-1303-F. The Court awards defendant P. Lanell $25.00 in damages plus his reasonable attorneys fees. Defendant P. LaneU shaU file his motion and supporting affidavit for reasonable attorneys fees within 60 days of the date of this Order.

 Attorney Boileau was at the time counsel for P. Lanell in the divorce action filed by K. Lanell and pending in the Probate and Family Court Department, Essex County. Pursuant to a Stipulation, dated December 28, 2001, Mr. and Mrs. LaneU, though their respective divorce attorneys, and Redlich agreed to distribute part of i2’s settlement offer of $1,454,742.50 in a certain way and to deposit the balance in an escrow account, with Atty. Boileau acting as the escrow agent.
*714 Subsequently on December 22, 2003, Atty. Boileau moved to deposit the funds with this court and be dismissed out of the case, which motion was allowed. On January 5, 2004, pursuant to the order of this court, Atty. Boileau deposited the funds plus interest with this court.

 Although the parties dispute the date on which P. Lanell signed the CFA, there is no dispute that he, in fact, executed it and that the CFA became effective between December 27, 2001 and January 2, 2002.

 Subsequently, Peter Lanell was joined as a co-defendant with K. Lanell in this action.

 General Laws, c. 149, §150, states, in relevant part:
Any employee claiming to be aggrieved by a violation of section 148 ... may... institute and prosecute in his own name ... a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of litigation and reasonable attorney fees.

 Since a significant portion of this case involves questions raised about Redlich’s professionalism, the Court notes that except for P. Lanell’s January 2002 complaint to the Board Of Bar Overseers (BBO), no person has lodged a BBO complaint against Redlich in his 33 or so years of law practice.
No evidence was presented in this case regarding what action, if any, the BBO took on P. Lanell’s complaint.

 Before January 1, 1998, the Canons of Ethics and Disciplinary Rules governed attorney conduct: since that date, the Massachusetts Rules of Professional Conduct have applied.

 Mass.R.Prof.C. 1.16 provides rules for both mandatory and permissive withdrawal. In addition to allowing termination when the client will not be affected in a materially adverse way or when the client fails to fulfill his obligations to the attorney, Rule 1.16 provides other instances where an attorney may withdraw including when: (1) the client persists in a course of action involving the lawyer’s services that the lawyer reasonably believes is criminal or fraudulent; 2) the client has used the lawyer’s services to perpetrate a crime or fraud; 8) a client insists upon pursuing an objective that the lawyers considers repugnant or imprudent; 4) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or 5) other good cause for withdrawal exists.

 The meaning of contractual “benefit” and “detriment” is well established. See Graphic Arts Finishers, Inc. v. Boston Redevelopment Authy., 357 Mass. 40, 42-43 (1970).

 These factors mirror both Rule 15(a)(1) which considers the “time and labor required” and “the novelty and difficulty of the questions involved” and also the Restatement (Third) of the Law Governing Lawyers §35, CMT. c. which states that large contingency fees unearned by either effort or a significant period of risk are considered unreasonable.

 The agreement provided that the incentive bonus would apply to any settlement offer accepted after that date which was within ten percent of that offered during the ninety-day period. Neither party challenges the reasonableness of the bonus agreement.

 This amount differs from the invoices provided in Exhibit 3 because of an accounting error on Redlich’s part. On the December 3, 2001 invoice, Redlich applied a credit of $8,303. This credit was incorrectly computed by dividing $17,606 to equal $8,303. The correct amount should have been $8,803. The court credits Lanell for the $500 difference.

 The total due under the hourly agreement is calculated by adding: 1) Redlich’s portion of the October2001 hourly invoiced amount of $4,697; 2) to Redlich’s portion of the November 2001 hourly invoiced amount of $10,303; 3) to the December 2001 hourly invoiced amount of $5,786; 4) to the January hourly invoiced amount of $8,271; 5) to the agreed to bonus of five percent of $1.454 million or, $72,700. The invoice date represents billing for the prior month’s services. The billing months of October and November include billings for another client of Redlich and former i2 employee, Keith Hamel. Per prior agreement, P. Lanell and Hamel agreed to split expenses.

 The total number of hours is calculated by summing the following: 1) invoice date October 2001 30.8 hours divided between P. Lanell and Hamel. 15.4; 2) invoice date November 2001,68.3 hours divided betweenP. Lanell and Hamel, 34.15; 3) invoice date December 2001, total hours 17.6; and 4) invoice date January 2002, total hours 30.8 hours.

 P. Lanell does not argue, and therefore the court does not address, the reasonableness of the five percent bonus agreement.

 Calculated by dividing $101,757 by ninety-eight hours actually worked.

 Redlich maintained separate invoicing systems for the “Massachusetts litigation,” any hours related to the claim P. Lanell filed in Massachusetts and the ‘Texas litigation,” any work related to i2’s filing of a claim in the federal district court in Texas. While the Court reserves comment on the lawfulness of this type of arrangement, the hours on both invoices are noted to accurately assess Redlich’s effort. The invoicing under the “Massachusetts litigation” totaled 118 for the March 2002-July 2002 period and 113 hours for ‘Texas litigation.”

 Comment 3 states:
An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client’s interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction. However, it is proper to define the extent of services in light of the client’s ability to pay. A lawyer should not exploit a fee arrangement based primarily on hourly charges by using wasteful procedures. When there is doubt whether a contingent fee is consistent with the client’s best interest, the lawyer should offer the client alternative bases for the fee and explain their implications. Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage.
(Emphasis added.)

 Receipt of a payment of $20,000 would have substantially reduced the past due amount to Redlich and undermines the claim that P. Lanell could not pay. In addition, the non-refundable attorney fee represents yet another potential windfall to Redlich if the settlement could be reached quickly.

 The issue relative to the application of G.L.c. 149, §148 is whether the Wage Act applies to high income earners such as P. Lanelle. The statute contains a provision allowing treble damages if Lanelle could prove the act covered his commissions. G.L.c. 149, §148.

 While the court could speculate as to a reasonable figure as to the value to be attached to Redlich’s services, Redlich provides detailed records of actual hours spent so conjecture is not necessary.

 On March 8, 2002, John Legasey received copies of the December 27, 2001 contingent fee agreement between Redlich and P. Lanell, as executed and the January 22, 2002 modification, in a package of documents from Carol Boileau. Prior to this time, neither Legasey nor Kathleen Lanell had seen the December 27, 2001 CFA, as executed.